David S. Bloch (SBN CA 184530)
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone:     415.590.5110
Facsimile:     415.707.2010
blochd@gtlaw.com

Yang Liu (SBN CA 319390)
GREENBERG TRAURIG, LLP
1900 University Avenue, 5th Floor
East Palo Alto, California  94303
Telephone:     650.328.8500
Facsimile:     650.328.8508

Joseph Petrosinelli (*pro hac vice* pending)
C. Bryan Wilson (*pro hac vice* motion forthcoming)
Angela Pyo (SBN 337973)
Jack H. Danan (*pro hac vice* motion forthcoming)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:     202.434.5547
Facsimile:     202.434.5029
jpetrosinelli@wc.com
cwilson@wC.com
apyo@wc.com
jdanon@wc.com

Attorneys for Plaintiff
MOTIVE TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTIVE TECHNOLOGIES, INC., a Delaware Corporation | CASE NO. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| SAMSARA INC., a Delaware corporation. Defendant. | **DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff Motive Technologies, Inc. ("Motive"), for its Complaint against Defendant Samsara, Inc. ("Samsara"), brings claims for patent infringement, fraud, false advertising under the Lanham Act, unfair competition through deceit and fraud, defamation, and theft of Motive's trade secrets, among other things, and states and alleges as follows:

**NATURE OF THE ACTION**

1.      Motive was founded in early 2013 (as KeepTruckin), with a vision to build technology that would improve the safety and efficiency of America's transportation industry.  Motive's singular focus on its customers' most pressing operational needs has led to the release of the only AI-powered platform to combine driver safety, fleet management, equipment monitoring, and spend management in one solution. Today, Motive serves over 120,000 customers across North America (including America's largest fleets), with more than 1 million vehicles and assets managed on its platform.

2.      Motive brings this suit against Samsara, a company that attempts to compete with Motive for customers in the marketplace, but has done so using unethical, improper, and unlawful tactics.  Samara has engaged in these tactics because it continues to lag behind Motive in its technology.

3.      In December 2013, over a year before Samsara incorporated, Motive pioneered the first Android and iPhone based fleet management and electronic logging platform in the industry, depicted below:

Complaint                                                                                                    Case No.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Fleet Management**

**Electronic Logging**

4.       In January 2015, Motive began designing a proprietary Vehicle Gateway (LBB-1), the first vehicle telematics device to contain an advanced processor, 4 GB of storage, WiFi and Bluetooth radios, multiple USB interfaces, and running the Linux operating system instead of the real-time operating systems used by traditional telematics devices.   Motive created a Vehicle Gateway with more capabilities than traditional telematics devices because Motive intended to add more software applications, and attach additional devices to the Vehicle Gateway over time.   Most importantly, Motive envisioned a connected dashboard camera ("Dashcam") using the USB interface so that customers could combine driver safety and fleet management in one integrated platform.

//

//

//

**Complaint**                                                                                           **Case No.**

1

**Picture of Motive's first Vehicle Gateway, dated August 21, 2015:**

2

3



4

5

6

7

8

9

10

11

12     5.     Before Samsara ever began operating as an industrial sensor start-up in 2015, thousands of

13   fleets were already using Motive to improve the safety and efficiency of their operations.  Contrary to

14   Samsara's false claims in the marketplace that it was the innovator of this technology, Samsara released its

15   first Vehicle Gateway in 2016, well after Motive, as depicted here:

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint**                                                                                                    **Case No.**



6.      In April 2017, Motive acquired Ingrain, an AI startup that was developing cutting-edge computer vision technology, and tasked the Ingrain team with building AI models to detect unsafe driving behavior for the Motive Dashcam.  A Motive team of 25 engineers and 35 data annotators invested over three years of effort to build the first AI models to accurately detect driver cell phone use and tailgating. Motive first released a road-facing dashcam in 2018, allowing customers to obtain video of safety events captured by the Vehicle Gateway.  Motive released its AI Dashcam in August 2021, after it confirmed that the AI models performed to the highest degree of accuracy.

7.      Samsara chose a different path.  In February 2019, Samsara rushed to market its so-called AI dashcam, claiming the product used AI to detect tailgating, cell phone use, and driver distraction to "prevent accidents before they happen."  This is the same AI dashcam Samsara sells today.  As discussed below, two independent, third-party studies that Motive commissioned in 2021 and 2023 show that Samsara's dashcam is unable to consistently and reliably detect the unsafe driving behaviors Samsara advertises it can, and

Samsara's dashcams lack the AI capabilities that it claims they have had since 2019.  Samsara's false claims include the ones noted below:







**Complaint**                                                                                                     **Case No.**

8.     While all of the above events were unfolding, Samsara, fearful it continued to lag behind Motive, hatched a plot to use a series of unlawful, deceitful, and fraudulent tactics, in an effort to try to catch up with Motive and copy Motive's technology.

9.     The scope of Samsara's fraud and unfair competition is staggering.  Among other things, Motive has documented proof of a years-long campaign of Samsara's deceit, including that:

    a.   for almost six years, beginning in at least 2016 and running through at least June 2022, multiple Samsara design engineers and employees falsely posed as Motive customers, set up accounts on Motive's platform, often using phony user ID names such as "Flanders Foundation," "Indus Enviro," and "PNP Transportation," and accessed Motive's platform in an effort to steal Motive's technology.  Motive is currently aware of at least 30 accounts that Samsara employees created and accessed repeatedly during Samsara's six-year scheme;

    b.   among the Samsara personnel who set up these phony accounts and repeatedly accessed Motive's platform are senior Samsara executives Kiren Sekar, *Samsara's Chief Product Officer and Chief Strategy Officer*—the person who leads Samsara's global product organization and oversees Samsara's entire product strategy—Sean McGee, *Samsara's Vice-President of Product Platform Infrastructure*, Nirav Patel, *Samsara's Vice President of Business Operations,* Rushil Goel, *Samsara's (now former) VP of Products*, and several named inventors on Samsara's patents who accessed Motive's platform before filing their patent applications.  The chart below shows only some examples of Samsara's multi-year fraudulent scheme of accessing Motive's platform:

| Fake Company/Name | Samsara Employees Associated with the Account | Created At |
|---|---|---|
| N/A | Billy Waldman[1]<br>*Director of Product Management* | 2016-04-10 05:09:34 UTC |
| N/A | Michael Ulrich<br>*Account Executive* | 2016-11-20 01:17:38 UTC |
| Pat Sorn | Patrick Sornsin<br>*Account Executive* | 2017-06-24 01:45:04 UTC |
| Lo Kri Transport | Lauren Roberts<br>*AVP Sales* | 2017-08-02 18:14:38 UTC |
| N/A | Jonte Craighead[2]<br>*Product Manager* | 2017-08-31 20:13:59 UTC |
| PNP Transportation | Ian Solomon<br>*Senior Sales Manager* | 2017-10-25 |
| N/A | Nirav Patel<br>*Vice President, Business Operations* | 2017-11-10 21:13:47 UTC |
| Nirvana Test Account | Rushil Goel[3]<br>*VP, Product* | 2018-01-19 02:18:02 UTC |
| N/A | Corbin Muraro[4]<br>*Product Designer* | 2018-02-07 02:35:48 UTC |
| self | Kiren Sekar[5]<br>*Chief Product Officer* | 2018-02-28 15:12:30 UTC<br>2018-07-23 15:42:14 UTC |

---

[1] Mr. Waldman is a named inventor on at least one patent Samsara has sought to assert against Motive—a patent Samsara filed after Mr. Waldman's first access to Motive's platform.

[2] Mr. Craighead is a named inventor on at least one Samsara patent filed after Mr. Craighead's first access of Motive's platform.

[3] Mr. Goel is a named inventor on at least one Samsara patent filed after Mr. Goel's first access of Motive's platform.

[4] Mr. Muraro is a named inventor on at least one Samsara patent filed after Mr. Muraro's first access to Motive's platform.

[5] Mr. Sekar is a named inventor on at least one Samsara patent filed after Mr. Sekar's first access to Motive's platform.

**Complaint**                                                                 **Case No.**

| Flanders Foundation | Michael Ross[6]<br>*Director,*<br>*Product Management*<br><br>Sean McGee[7]<br>*VP, Product - Platform &*<br>*Infrastructure* | 2018-03-09 02:29:04 UTC<br><br>2018-03-11 06:37:33 UTC |
|---|---|---|
| Indus Enviro | Ishaan Kansal[8]<br>*Product Designer* | 2018-09-27 22:18:36 UTC |
| Donald Karel | Donald Donkers<br>*Product Manager* | 2018-10-24 03:08:26 UTC |
| N/A | Matt Basham[9]<br>*Senior Product Designer* | 2019-08-22 14:03:11 UTC |
| N/A | Emily White<br>*Product Design Manager* | 2019-10-10 17:39:07 UTC |
| dnol inc | Dave Nolan<br>*Product Manager* | 2020-02-06 23:05:23 UTC |
| Frank Jon | Jeff Angius<br>*Tech Support* | 2020-03-06 06:07:24 UTC |
| N/A | Alan Liu[10]<br>*Senior Product Designer* | 2020-03-12 00:09:36 UTC |
| Test Rest | Semur Nabiev<br>*Full Stack Engineer* | 2020-08-19 02:57:25 UTC |
| N/A | Faiz Abbasi[11]<br>*Engineering Manager* | 2020-08-27 23:27:47 UTC |
| Uncle Bob | Ishan Tikku<br>*Product Manager* | 2021-06-23 03:30:31 UTC |

---

[6] Mr. Ross is a named inventor on several Samsara patents filed after Mr. Ross' first access to Motive's platform.
[7] Mr. McGee is a named inventor on at least one Samsara patent filed after Mr. McGee's first access to Motive's platform.
[8] Mr. Kansal is a named inventor on several Samsara patents filed after Mr. Kansal's first access to Motive's platform.
[9] Mr. Basham is a named inventor on at least one Samsara patent filed after Mr. Basham's first access to Motive's platform.
[10] Mr. Liu is a named inventor on at least one Samsara patent filed after Mr. Liu's first access to Motive's platform.
[11] Mr. Abbasi is a named inventor on at least one Samsara patent filed after Mr. Abassi's first access to Motive's platform.

**Complaint**                                                                                              **Case No.**

c.  in setting up these fake customer accounts on Motive's platform, on at least one occasion Samsara identified the phony company by using the official identification number that the U.S. Department of Transportation ("DOT") issues to actual commercial carriers[12], to make it appear as if the company was legitimate—such false use of a federally-issued DOT ID number can be prosecuted under federal fraud and identity theft statutes;

d.  Samsara sales representatives provided Motive customers and prospective customers with a chart (reproduced in paragraph 89 below) purporting to compare Samsara's and Motive's products, including their dashcam technologies, falsely claiming that Samsara's products could do things Samsara knew they could not, and that Motive's products could not do things that they could, all in an effort to steal customers from Motive under false pretenses;

e.  at least one Samsara employee called a Motive customer, claiming that she was a *Motive* sales representative, in an effort to steal that customer from Motive, which indicates that Samsara had a copy of Motive's detailed customer lists and was training its employees to misrepresent themselves to Motive's customers;

f.  in late 2019, Samsara began a campaign to hire key members of the Motive engineering team to steal trade secrets and intellectual property.  Samsara hired Olivier Boireau, Motive's former VP of Hardware Engineering, in 2019, and in 2021 hired Pearl Lai, Motive's former Engineering Manager for its Vehicle Gateway, AI Dashcam and Asset Gateway products in Taiwan; and

g.  Samsara hired former Motive sales representatives who downloaded Motive customer lists and brought them to Samsara in an effort to steal customers from Motive.

---

[12] For example, "Nirvana Test Account" used a DOT number associated with an actual trucking company based in Kentucky.

**Complaint**                                                                                      **Case No.**

10.     All of the above conduct violates Samsara's own Code of Conduct, which is posted on its website and states (falsely) that Samsara "does not seek competitive advantages through illegal and unethical business practices."

11.     Samsara is a public company, which requires it to file annual and quarterly reports with the U.S. Securities and Exchange Commission (SEC) disclosing, among other things, material facts about the operation of and risks to its business.  Knowing about all of the above conduct by its employees–because Motive informed them of it–Samsara's CEO (Sanjit Biswas) and CFO (Dominic Phillips) signed and submitted false SEC filings, including Samsara's 2023 Form 10-K that claimed "What Sets Us Apart" is "our differentiated company culture," which focuses on the company's "values," "operat[ing] with trust and respect," and "keeping our standards high through every part of our organization."  Samsara's SEC filings did not (and do not) disclose that it knew its employees had engaged in all of the above fraudulent conduct against Motive and had repeatedly violated the company's own Code of Conduct, which renders multiple statements in the company's SEC filings false and misleading.  Samsara has purposefully concealed all of its own fraudulent conduct from its public shareholders.

12.     Samsara paired its fraudulent conduct with infringement of Motive's patents.  For example, Samsara's dashcams (including its CM31 and CM32 dash cams) use precisely the same calibration techniques as Motive's AI Dashcam to determine the height of the cameras, a critical aspect to ensure proper machine-learning operations.  Samsara's pattern of misconduct had the ultimate goal of misappropriating and imitating Motive's superior technology.

13.     In 2021, in order to combat Samsara's false statements in the market about the capabilities (or lack thereof) of its products and false disparagement of Motive's products, Motive commissioned an independent, third-party study by a respected product testing firm, Strategy Analytics, Inc., to compare Motive's AI Dashcam with Samsara's dashcam.  The results were clear:  Motive's AI Dashcam far

outperformed Samsara's in every respect, including in detecting lack of seat-belt use, close following, and cellphone use.  In April 2022, Motive posted Strategy Analytics' 25-page report, which contains supporting data, video, and test results, on Motive's website, so that all customers in the industry could see the truth about the superiority of Motive's AI Dashcam.

14.     Samsara, of course, did not like the Strategy Analytics results, because they exposed the basic functional gaps in the Samsara product and the lies Samsara had been spreading in the market about its dashcam's capabilities.  Most importantly, the test results exposed that use of Samsara's dashcam was posing safety risks to drivers and the public.

15.     Samsara immediately began falsely claiming to customers that the Strategy Analytics test results were designed to favor Motive and that Samsara's dashcam was better than the results indicated. Samsara's complaints centered on confessions about its product's limitations–for example, its dashcam is not able to detect close following events until they happen for 30 seconds or more, a time period in which a vehicle operating at 60 miles per hour would have traveled a full half mile.  Samsara also attempted to pressure Motive to remove the report from Motive's website, because Samsara didn't want customers to see it or confess to these obvious limitations.

16.     Motive explained to Samsara in great detail why the Strategy Analytics testing produced reliable, valid results.  Further, Motive invited Samsara to jointly engage another independent third-party, to be mutually agreed by the parties, to again test the two companies' dashcams head-to-head—which Motive was confident would confirm the Strategy Analytics results and prove once again that Motive's product was superior.  Samsara refused.

17.     In 2023, Motive therefore commissioned another independent, third-party study comparing the Motive and Samsara dashcams, this time by the Virginia Tech Transportation Institute ("VTTI"), one of the most prestigious research institutes in the transportation field, and part of Virginia Tech, one of the

Complaint                                                                                                            Case No.

premier engineering colleges in the United States.  The VTTI study and testing found the same thing Strategy Analytics had:  Motive was more likely to issue a successful in-cab alert compared to Samsara for phone calls, lap texting, 45-degree texting, close following, and rolling stop trials across all lighting conditions.  Samsara has falsely claimed that this study, too, was somehow not fair.

18.     Two independent third party studies have now confirmed what Motive already knew:  simply put, Motive's products are better than Samsara's.  Samsara—knowing its products are inferior to Motive's—decided to resort to the above fraudulent and underhanded practices in an effort to deceive customers and prevent them from learning the truth about Motive's superior technology.

19.     Despite Samsara's unethical, improper, and unlawful efforts to compete in the marketplace, Motive was content to let its products and services do the talking: customers continue to favor Motive's technology over Samsara's; Motive continues to beat Samsara in the fleet management and driver safety market; and Samsara continues to refuse to sponsor and make publicly available any head-to-head testing of the two companies' dashcams.

20.     However, because Samsara cannot successfully compete against Motive based on the merits of the two companies' products, Samsara recently decided to try to silence Motive, cast doubt on Motive's ability to operate, and stifle competition by resorting to litigation, filing a lawsuit against Motive in Delaware (not California, where both companies are located), complete with a splashy marketing campaign touting its false litigation claims, and a second complaint with the U.S. International Trade Commission regarding certain of its patents—patents that Motive obviously does not infringe, if they are even directed to patentable subject matter in the first place.  Samsara is acting with malice in an attempt to cast doubt on fair competition in a technology industry where products often have the same basic functionality, are easily accessible, and can be compared on a daily basis by their users.  Samsara's goal is to cost Motive millions

Complaint                                                                                                                          Case No.

of dollars in litigation fees, hundreds of millions of dollars in lost revenue, and billions of dollars in lost brand value.

21.     Faced with an onslaught of tactical and bad faith litigation, Motive—the actual injured party here—now brings its own claims against Samsara, in the jurisdiction where the companies are located, to show the truth about Motive's industry-leading products, Samsara's inferior copies, and Samsara's lies and deception; to recover damages caused by Samsara's fraudulent behavior; and to stop Samsara from continuing to compete unfairly in the marketplace.

## PARTIES

22.     Motive is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 55 Hawthorne Street, Suite #400, San Francisco, CA 94105.

23.     Samsara is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1 De Haro Street, San Francisco, CA 94107.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

25.     This Court has personal jurisdiction over Samsara because Samsara is a citizen of California.

26.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391 (b) and 1400 (b) because defendant Samsara is based in and hence resides in San Francisco, and because a substantial portion of the acts giving rise to liability both took place in San Francisco and were directed at Motive in San Francisco.

## DIVISIONAL ASSIGNMENT [Civ. L.R. 3-5(b)]

27.     Under General Order No. 44(D)(3), claims involving intellectual property rights such as patent rights are assigned district-wide and may properly be heard in any venue in this District.

28.     However, Motive's non-intellectual property claims arise in the City and County of San Francisco and shall be assigned to the San Francisco Division or the Oakland Division.  Civil Local Rule 3-2(d).

**FACTS**

**MOTIVE IS AN INDUSTRY PIONEER**

29.     Motive—not Samsara—is the true innovator and pioneer in the fleet management and physical operations market.  Samsara followed Motive, and has struggled to keep up with Motive's superior product offerings and more satisfied customer base and users.  Because of its struggles, Samsara has resorted to unethical, improper, and unlawful tactics to try to compete against Motive's technology.

30.     Motive was founded in 2013, and was at the time known as "KeepTruckin."  Motive began with the vision to build technology that would improve the safety and efficiency of America's transportation industry.  Motive sought, and still seeks, to save lives and solve its customers' most pressing operational needs.

31.     The initial step in achieving this vision, in December 2013, was Motive's launch of the first Android and iOS based fleet management and electronic logging platform in the industry.  But this was only the beginning; in 2015 Motive soon followed with its first hardware product, a proprietary Vehicle Network Gateway (LBB-1).

32.     Motive's Vehicle Gateway, the LBB-1, was the first vehicle telematics device to contain an advanced processor, 4 GB of storage, WiFi and Bluetooth radios, multiple USB interfaces, and running the Linux operating system instead of the real-time operating systems used by traditional telematics devices.  Motive ultimately envisioned offering customers a connected dashcam using the USB interface so that customers could combine driver safety and fleet management in one integrated platform.

33.    By contrast, Samsara incorporated two years after Motive, in 2015, and initially sold only temperature sensors, as is described online when the company launched: https://medium.com/@biswas/announcing-samsara-internet-connected-sensors-24484e7c33c6.



34.    In other words, Samsara entered the fleet management, telematics, and compliance space long after Motive.  Samsara's products with which it entered into this space were copied from Motive's. For example, Motive launched a redesigned Driver App in July 2015; Samsara's first Driver App was released in July 2016 and used an identical interface, as shown below:

Complaint                                                                                    Case No.

35.    As time moved forward, Samsara's ability to build and debut products was based in substantial part on Samsara employees surreptitiously accessing Motive's platform in an effort to copy Motive's technology.

36.    By the time Samsara followed Motive into the fleet management and electronic logging market, Motive was well ahead, particularly in the trucking industry, a lead that Samsara sought to take from Motive.

37.    In early 2017, Motive acquired Ingrain, an AI startup, and began working on cutting-edge new technology that could detect unsafe driving behavior.  Motive invested over three years of effort and resources to build its first accurate AI Dashcam models.  Motive understood that inaccurate AI models would not make drivers safer—it would only train them to ignore false alarms or rely on alarms that never sounded. In 2018 Motive first released a road-facing dash cam that allowed fleets to quickly retrieve video of harsh driving events. But Motive waited until 2021 to release its AI Dashcam, after Motive was able to confirm the accuracy and safety of the AI models.  In other words, Motive was focused on building the best and safest product for its users, which meant it was unwilling to rush an inferior product to market.

38.    Samsara did the opposite, rushing to market a flawed and low-performance AI dashcam product in 2019.  Samsara claimed it used AI to detect tailgating, cell phone use, and driver distraction to "prevent accidents before they happen."

39.    This is the same AI dashcam that Samsara still sells today, even though—as confirmed by two independent, third-party studies—Samsara's dash cam is unable to detect the unsafe driving behaviors Samsara advertises it can, and Samsara's dash cams lack the AI capabilities that it claims they have had since 2019.

40.    Motive has continued to innovate in technologies that power the physical economy, and offers a number of unique product features, including fuel cards for expense management, machine learning

**Complaint**                                                                    **Case No.**

models for safety and fuel usage, and an AI Omnicam to provide 360-degree visibility around a vehicle. Motive also offers its own versions of industry-standard products.

41.     Motive's offerings include its AI Dashcam, which Motive released after years of development on a platform that is entirely different from Samsara's low-performance product.  Motive also has meaningfully improved its Dashcam since the initial release by leveraging AI to automate coaching and offer real time alerts for harsh events and high-risk behavior detection, including close following, cell phone use, failure to use seat belt, and distracted driving.

42.     Motive's superior product offerings have helped Motive surpass Samsara in the market. Samsara has responded with the unlawful and underhanded business practices described herein.

### FOR AT LEAST SIX YEARS, SAMSARA EMPLOYEES ACCESSED MOTIVE'S PLATFORM TO ATTEMPT TO COPY MOTIVE'S TECHNOLOGY

43.     When Motive customers purchase Motive's products, they create accounts to connect to the Motive Fleet Dashboard, which allows them to manage their drivers and vehicles from a single cloud-based platform.  On initial login, the customer creates a secure password and inputs its company (or individual) name, email address, and other identifying information.

44.     Beginning in at least 2016, just a year after Samsara was founded and while it was still developing its initial products, Samara began a scheme to access Motive's Driver App and Fleet Dashboard under false pretenses and attempt to copy Motive's technology.  For example, on April 10, 2016, Samsara employee Billy Waldman (Director of Product Management) created an account on Motive's platform and accessed it multiple times over at least the next year.  On August 2, 2017, Lauren Roberts, then Samsara's Vice President of Sales, created an account on Motive's platform using her personal email address and the fake company name "Lo Kri Transport."  She too accessed the account for over a year.

45.     For at least the next six years, through at least June 2022, Samsara employees created and accessed at least 30 customer accounts on Motive's platform, with multiple accounts opened most years.

The Samsara employees who did so were not lower-level personnel, but rather included multiple senior executives at the company. They also included multiple Samsara employees who were listed as inventors on patent applications Samsara filed *after* these employees first fraudulently accessed Motive's platform.

46.     For example, Kiren Sekar is both the Chief Product Officer and Chief Strategy Officer of Samsara—one of the most senior executives in the entire company, who was one of the original employees at the company's founding. Samsara's website states that Mr. Sekar is "responsible for company strategy," "leads Samsara's global product organization … overseeing the company's product strategy, roadmap, and development activities," and "previously led the Product organization from founding through Samsara's IPO, and also led Marketing at Samsara from founding until 2021."

47.     On at least two occasions, Mr. Sekar created phony customer accounts on Motive's platform. On February 28, 2018, he created an account under the username "Kevin Smith," using a personal email address to register the account, and on July 23, 2018 he created a second account under the username "test test" and the company name "self," using a different personal email address. He accessed these accounts multiple times.

48.     Similarly, Sean McGee is Samsara's Vice-President of Product - Platform & Infrastructure, in which he leads product development and strategy, especially relating to platforms. On March 9, 2018, Mr. McGee and his Samsara colleague Michael Ross (Director, Product Management) created a customer account on Motive's platform using the fake company name "Flanders Foundation" and a personal email address. Mr. Ross purchased a Vehicle Gateway from Motive on March 8, 2018. Three months later, on June 10, 2018, Mr. McGee also created a separate account under his own name, using a different personal email address. These accounts were repeatedly accessed by Mr. McGee and Mr. Ross multiple times over at least the next three years.

49.     Based on Motive's investigation to date, the chart at paragraph 9 above gives examples of the fake customer accounts registered by Samsara employees on Motive's platform and the scope of the scheme Samsara hatched to steal and/or copy Motive's technology.

50.     In a market with free and open competition, competitors in the technology sector often access and use each other's products, test them to determine their capabilities and limitations, and compare their products to their competitors' products, in an effort to provide consumers with the best possible products and truthful information about the available options.  Motive has no issue with competing with Samsara (or any other company) in that fashion.  But that is not what Samsara has done.

51.     On information and belief, Samsara employees accessed Motive's platform under the false pretenses described above with the specific intent to steal and/or copy Motive's fleet management technology, platform capabilities and features, and business and marketing strategy, including to attempt to reverse-engineer the source code or underlying algorithms of the technology.  These efforts were carried out by and/or approved by Samsara's senior executives and employees; these employees knew they were acting improperly and unlawfully, but did so because Samsara's technology was inferior to Motive's, and they hoped to incorporate Motive's technology into Samsara's products.

52.     In June and July 2022, Motive discovered the years-long Samsara fraudulent scheme to access Motive's platform.  In late July 2022, Motive informed Samsara's management, legal department, and Board of Directors (through Samsara's outside counsel) of the above facts about Samsara's conduct, and demanded that Samsara immediately cease and desist.  Samsara waited almost two months to respond, then admitted that its employees had surreptitiously accessed Motive's platform under false pretenses, but claimed that Samsara "has never condoned" such conduct (even though, as described above, the employees who accessed the platform were senior executives at the company, including its Chief Product Officer) and

that the misconduct occurred "years ago" (even though the access continued into June 2022, just before Motive notified Samsara).

**MOTIVE'S PATENT AND SAMSARA'S INFRINGING PRODUCTS**

53.     Samsara's scheme extended to infringing Motive's patents on Motive's dashcam technology. On January 16, 2024, the United States Patent and Trademark Office duly and lawfully issued to Motive U.S. Patent No. 11,875,580 (the "'580 Patent"), entitled "Camera Initialization for Lane Detection and Distance Estimation Using Single-View Geometry," a true and correct copy of which is attached as **Exhibit A**. The '580 Patent is valid and enforceable.  The '580 Patent discloses and claims various novel, non-obvious, and useful features relating to the calibration of dashcam sensor (e.g., camera) parameters for use in, *inter alia,* on-device machine learning and/or artificial intelligence applications relating to automotive monitoring functions.

54.     The inventors of the '580 Patent faced, and solved, several technical problems facing in-vehicle dashcam devices.  Previous systems required a "predefined or preset" positioning of the camera, which is prone to human error. Ex. A at 1:10–17.  Alternatively, previous systems required the use of radar or Lidar to aid in object detection, a technically complex and computationally expensive approach.  *See id.*

55.     Motive's inventors realized that the ability to use a monocular and adjustable camera would solve these technical problems resulting from the use of multiple cameras or non-image sensors (e.g., radar or Lidar).  *See id.* at 1:6–25.  However, Motive's approach would require innovations in how to determine the position of a single outward-facing camera, regardless of how the camera is positioned on a vehicle, a problem previously unsolved in the industry.

56.     To solve this problem, claim 1 of the '580 Patent describes a system that can receive video (e.g., image frames) from such an adjustable camera.  The system then first uses a predictive model to identify various reference lines in the video (e.g., a horizon line) automatically and without human

-21-

intervention.  Using this automatically determined horizon line, the system can determine a camera parameter (e.g., the height of the camera) based on the lines and can then generate a digital video (e.g., image frames) that overlay the horizon on the images captured by the dashcam.  To aid in confirmation, the system can then transfer the predicted horizon line (and other lines) to an annotator for confirmation before automatically adjusting the dashcam parameters based on the automatically determined parameter.

57.     The recited system was unconventional and not well understood at the time of the invention of the '580 Patent, as outlined above.  Further, such a system implements a solution that utilizes predictive modeling, camera parameter estimation, and a confirmation workflow.  Such a system cannot be implemented in the human mind, as it requires implementation with computers and electronic equipment, e.g., to use a predictive model to identify the horizon line, to estimate a camera parameter based on the horizon, generating overlaid images, and communicating with network devices to confirm the horizon.

58.     Samsara makes, uses, sells, and offers to sell in-vehicle dashcam devices including its CM31 and CM32 dashcams (the "Infringing Dashcams").

59.     Samsara makes, uses, sells access to, and offers to sell access to a software-as-a-service platform referred to as its "Connected Operations Cloud" or "Samsara Cloud" (and similarly named services) that receives data from dashcams and provides analytics and control interfaces for customers that install the Infringing Dashcams (the "Infringing Platform").

60.     The Infringing Dashcams and Infringing Platform (collectively, the "Infringing Products") operate in synchrony to provide fleet management services to Samsara's customers.  The Infringing Products infringe Motive's '580 Patent.

**SAMSARA SOLICITS MOTIVE'S EMPLOYEES AND STEALS MOTIVE'S CONFIDENTIAL INFORMATION**

61.     As part of its scheme to unlawfully compete with Motive, Samsara has also actively solicited Motive's employees to join Samsara in order to acquire Motive's confidential and proprietary information

relating to current and future product plans, sales, and prospective and existing customers.  Samsara's efforts to poach Motive employees has occurred over the course of years, as Samsara otherwise struggles to fairly compete with Motive's superior business and product offerings.

62.   Samsara has poached and attempted to poach multiple high-level employees, including high-level individuals—vice presidents, managers, and directors—from Motive's hardware engineering and software programming departments.

63.   On information and belief, Samsara encourages employees it has successfully poached from Motive to obtain and keep—in other words, steal—confidential information from Motive before their departure.  This includes confidential and proprietary information on Motive's products, customers, sales, and business strategies, among other areas of competitive interest.

64.   Motive has made extensive efforts to maintain the secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting electronic access to proprietary information, requiring employees to use company-provided computers, requiring employees to sign a Separation and Release agreement upon termination of their employment that reminds them of their confidentiality obligations, and performing exit interviews with employees who voluntarily depart.  Motive has informed any recipient of its proprietary information that the information is proprietary and has required any recipient of such information to maintain its confidentiality.

65.   On information and belief, Samsara hired former Motive employees who then provided confidential Motive information to Samsara, which unlawfully uses such information in Samsara's efforts to compete with Motive in the marketplace.

66.   Samsara's tactics have become increasingly aggressive over time, and now go beyond just stealing Motive's employees and confidential information.  Once Samsara has successfully convinced a

     

Motive employee to defect with that confidential information, Samsara actively shields those employees from Motive's efforts to lawfully reclaim its confidential information.

67.     As part of its campaign to assist former Motive employees in not returning confidential and proprietary information to Motive, Samsara's internal legal department has interfered with Motive's lawful attempts to retrieve its information.  This includes intercepting communications by Motive to its former employees and threats to Motive to cease trying to retrieve its information from those individuals.

68.     For example, in or around July 2022, Samsara hired a former Motive account executive ("Former Employee 1").  Shortly after Former Employee 1's departure from Motive, Motive's IT department determined that Former Employee 1 had downloaded a large number of files.  The download was highly suspicious because it included multiple files containing confidential and proprietary information about Motive's customers, pricing, sales, and business strategies, among other things.  Former Employee 1 had no valid work purpose for accessing and downloading these files.

69.     The files downloaded by Former Employee 1 include, among other things, Motive's proprietary method for setting its pricing and structuring its deals, and account lists that contain not only the names of current and potential customers, but also each customer's address, telephone number, contact person, private email address, prior order history, and pricing information.  Motive has gathered this customer information over the entire history of its operations, which span not only many years but thousands of hours of research, including prior order/pricing information.  Many of those on the list have been Motive's customers for years.

70.     When Motive attempted to explore the issue with Former Employee 1, Motive was quickly stonewalled.  Former Employee 1 refused to acknowledge the suspicious download of the files, and refused to answer any questions pertaining to them.  Former Employee 1 further refused to provide a declaration

or affidavit, as is customary in these circumstances, confirming Former Employee 1 did not intend to break the law by taking Motive's confidential and proprietary information.

71.     Upon further attempts by Motive to retrieve the stolen information from Former Employee 1, Samsara's internal legal department intervened, shielding Former Employee 1 from communications with Motive and demanding Motive provide additional information in support of its request.  When Motive provided a list of over 130 files it identified that Former Employee 1 had downloaded shortly before the employee left Motive, Samsara stopped responding.

72.     On information and belief, Samsara has also obtained from Motive employees confidential Motive information with respect to Motive's Dashcam; Samsara has used such information to help develop the latest version of Samsara's dashcam, which Samsara is in the process of launching.  Specifically, Samsara took Motive's confidential and proprietary information regarding the Ambarella platform that Motive uses in its dashcams.

73.     Motive began developing its AI Dashcam platform on an Ambarella chip in 2019.  Motive ultimately launched its Dashcam in 2021 using the Ambarella CV22 CVflow edge AI vision system on chip (SoC).  Motive's AI Dashcam was manufactured by Quanta Shanghai Manufacturing City ("QSMC"), a Taiwan-based company.  On information and belief, at the time, Motive was the only major fleet management dashcam provider using the Ambarella chip and, to this day, remains the only major fleet management dashcam provider using an Ambarella chip.  Samsara, along with some of Motive's other dashcam competitors, have used Qualcomm or other chip platforms for their dashcams.

74.     Although the fact that Motive was using an Ambarella chip for its AI Dashcam was publicly disclosed in 2021, certain technical specifications and designs are not generally known or readily ascertainable.  An Ambarella chip uses an entirely different architecture than the Qualcomm chip that Samsara and others in the industry use.  Motive thus spent considerable resources and time developing

proprietary specifications and designs to efficiently use, for example, the vector processor on the Ambarella chip, and effectively run the neural networks and AI models necessary for a superior dashcam product.

75.     On or around October 28, 2019, Samsara hired Olivier Boireau, Motive's former Vice President of Hardware Engineering—the individual responsible for all hardware at Motive.  Mr. Boireau, as head of hardware, was aware of Motive's plans to develop an Ambarella-based AI Dashcam, and was involved in fostering Motive's relationship with QSMC.  On information and belief, Mr. Boireau left Motive with confidential and proprietary information regarding Motive's plans to use the Ambarella platform in its AI Dashcam, and shared that information with Samsara.

76.     On or around August 6, 2021, Samsara also hired Pearl Lai, Motive's former Engineering Manager in Taiwan—the individual responsible for hardware at Motive's Taiwan office.  Ms. Lai had directly worked with QSMC on Motive's AI Dashcam product that uses the Ambarella chip.  On information and belief, Ms. Lai left Motive with confidential and proprietary information regarding Motive's specifications and designs for the Ambarella platform used on its AI Dashcam, and shared that information with Samsara.  Motive launched its AI Dashcam only weeks after Ms. Lai began at Samsara, on August 12, 2021.  On information and belief, Ms. Lai thus provided Samsara with knowledge of the inner workings of Motive's near-finished product.

77.     As independent studies and Motive's growing market share have proven since then, Motive's AI Dashcam and its unique Ambarella-based design has achieved superior performance compared to its competitors' dashcams.

78.     On information and belief, Samsara began developing a dashcam using the confidential and proprietary information taken from Motive and provided to Samsara by Mr. Boireau and Ms. Lai.  On information and belief, Samsara's new dashcam is in the process of being launched and features use of an Ambarella chip, and will be manufactured by QSMC—directly copying Motive's hardware design.

79.     On information and belief, Mr. Boireau and Ms. Lai also shared Motive's confidential and proprietary information regarding other Motive products that they worked on or had knowledge of, including Motive's Vehicle Gateway and Asset Gateway, with Samsara.

80.     Samsara's inducement of Motive employees to defect from Motive with confidential information is an attempt by Samsara to gain an unfair and unlawful advantage in the marketplace.

81.     This unfair and unlawful conduct harms Motive in multiple ways.  Motive loses valuable employees and confidential information to Samsara's unethical recruiting practices.  Motive must then expend time, money, and other resources in its attempts to retain employees.  Motive must further expend resources in attempts to lawfully retrieve its stolen information.

82.     Motive is further harmed in its ability to fairly compete in the marketplace by this conduct, because it results in Samsara's unlawful possession and use of Motive's confidential and proprietary information.

### SAMSARA UNLAWFULLY IMPERSONATES MOTIVE EMPLOYEES

83.     Samsara's deceptive practices extend to having its employees impersonate Motive employees in interactions with Motive's customers.  This illicit practice is designed to mislead and steal Motive customers.

84.     For example, on May 20, 2022, a sales representative from Samsara, who said her name was "Natalie," left a voicemail for a current Motive customer.  In an effort to have the customer call her back, she falsely identified herself as an employee of Motive, left her phone number, and asked for a return call. The customer called the number, and "Natalie" admitted she actually was an employee of Samsara.

85.     Samsara's deception upsets Motive's customers, who are satisfied with Motive's superior product offerings.  In fact, Motive customers have voiced their displeasure with such conduct directly to Motive, and their unhappiness with being exposed to Samsara's fraudulent and misleading conduct.

86.     Samsara's deceptive practices force Motive to expend valuable time, money, and resources in responding to them.  For example, because of Samsara's deception, Motive employees must work to maintain customer relationships, reassure current customers of their status, and continue to monitor further attempts by Samsara's representatives to impersonate Motive.  Impersonation of a competitor has no place in a free and fair marketplace.

## SAMSARA'S FALSE AND/OR MISLEADING ADVERTISING AND STATEMENTS ABOUT SAMSARA'S AND MOTIVE'S PRODUCTS AND TECHNOLOGY

87.     Samsara has also sought to unlawfully compete with Motive through advertisements and marketing materials that contain false and/or misleading claims about the functionality and efficacy of Motive's AI video-based safety applications (falsely claiming that Motive's products lack certain capabilities that they in fact have) and Samsara's own products (falsely claiming that Samsara's products have certain capabilities that they don't).

88.     Motive has notified Samsara on multiple occasions that Samsara employees are using false and misleading advertising to try to deceive customers about the relative capabilities of Motive's and Samsara's products, writing directly to Samsara's CEO and General Counsel about these issues.  Samsara initially promised it would put a stop to this unethical and unlawful business practice, but it continued unabated.

89.     For example, in December 2021, a Motive customer provided Motive with the below "Feature Differentiation" chart that Samsara sent to the customer in an effort to convince the customer to switch from Motive (then KeepTruckin) to Samsara:

Complaint                                                                                                          Case No.

| 9 Feature Differentiation | KEEP TRUCKIN Keep Truckin | Samsara |
| --- | --- | --- |
| **Mobile App Connectivity** | Relies on bluetooth in areas of low cellular connectivity | Logs are stored & compliant where cell signal is low. BT may disconnect if other apps are in use, causing log errors; our app uses WiFi |
| **GPS Ping Rate** | 30 second ping rate with breadcrumb view | Live-to-the-second |
| **Shareable ETAs** | Must opt into Smart Load Board to share ETAs with certain participating brokers | Easily share vehicle locations & ETAs with any designated recipient using Live Share |
| **Detention Times** | KT uses customer ELD data to calculate & share avg detention frequency & duration at drop locations for facility insights | Customers own their own data and insights in detention & time on site reports |
| **Alerts** | Email alerts only, no text messages | Email and text message alerts All KT alerts plus idling, speeding, and documents |
| **Dash Cameras** | No AI = only detects harsh events via accelerometer 720p No audio speaker | Accelerometer detects harsh events & crashes • AI detects rolling stops, speed limits, and can label distracted driving 1080p Proximity Search = easier to look up incidents Built-in speaker for in-cab coaching & alerts Still images every 5 min |

| 10 Feature Differentiation | KEEP TRUCKIN Keep Truckin | Samsara |
| --- | --- | --- |
| **System Architecture** | Great for smaller fleet operations & owner-operators subject to ELD | • Provides enterprise-grade visibility and fleet management tools for a wide range of industries in one integrated platform<br>• **Feedback model & pace of innovation** - Samsara shipped 200+ features in 2020 based on customer feedback. KT has fast-followed many of our innovations<br>• Started by developers from Google & Apple<br>• **Future proofing** - Hardware built to support new features over next 5+ years |
| **Pricing** | Tiered pricing based on feature-by-feature basis | • All functionality included in subscription cost<br>• Free automatic software upgrades and new features loaded over the air at no cost |
| **Expanded Business Segments** | Fleet and trailer only | **Samsara Connected Sites** - our newest segment dedicating to modernizing site security with our AI technology all in the same dashboard **Industrial/Equipment Monitoring** - extensive CAN info for machinery and advanced assets |

Screenshot

90.     Multiple statements within this advertisement are false and/or misleading, including the following:

Complaint                                                                                                              Case No.

91.     *First*, Samsara claimed that Motive's Vehicle Gateway has a 30-second GPS ping rate, while Samsara's product has a to-the-second ping rate.  That is false.  Motive's product provides a real-time, to-the-second ping rate that updates continuously while a vehicle is in motion.

92.     *Second*, Samsara claimed that Motive's dashcams have "no AI" and can only detect harsh events through an accelerometer.  That is false.  Motive's dashcams are driven by AI and can detect unsafe driving other than accelerometer-based harsh events.  For instance, Motive's dashcams can use AI and computer vision to detect close following, cell-phone use, seat-belt use (or lack thereof), and much more, even when harsh events are not detected.

93.     *Third*, Samsara claimed that Motive's products are suitable only for smaller fleet and trailer operations.  To the contrary, Motive's technology is designed for any company that operates commercial vehicles, from the nation's largest enterprise fleet companies to companies in construction, oil and gas, passenger transport, utilities, and field services.  Any suggestion otherwise is false.

94.     *Fourth*, Samsara claimed that Motive offers only tiered pricing on a feature-by-feature basis.  This is false.  Motive offers multiple different pricing packages based on its customers' unique and/or differentiated needs.

95.     Motive confronted Samsara with this false advertisement in December 2021, and explained why it was false, but Samsara refused to stop using it.

96.     In another instance, in April 2020, Samsara sought to take advantage of the COVID-19 pandemic to distribute additional false claims regarding the capabilities of its own products.  Under the guise of helping "essential businesses" during those "pressing times," Samsara sent potential customers misleading video footage that appeared to show Samsara's dashcam detecting instances of distracted driving in ways and within time intervals that independent testing has shown Samsara's dashcam cannot

detect.  Samsara sent these advertising emails and communications even though Samara knew its dashcam was not capable of such performance.

97.     Samsara has also promoted, and continues to promote, false and misleading statements about its own products.  For example, Samsara has posted multiple videos online, including on the company's website and on YouTube, which overstate the abilities of Samsara's dashcam.

98.     One such video, posted in February 2019, claimed that Samsara's product "contained artificial intelligence" that could be used to "prevent accidents before they happen" and detect certain instances of distracted driving.  These claims were false and misleading; Samsara's dashcam was unable to perform the tasks claimed.  Indeed, the video is still available online—and considering the poor performance of Samsara's dashcam in independent third-party testing, these statements regarding Samsara's dashcam's alleged capabilities remain untruthful and misleading.

99.     Samsara made these false and misleading statements, among other misrepresentations to customers and prospective customers, to gain an unfair competitive advantage.  These false and misleading statements impacted Motive's performance and standing in the marketplace.

## SAMSARA MISREPRESENTS INDEPENDENT THIRD-PARTY STUDIES THAT CONSISTENTLY CONFIRM THAT MOTIVE'S DASHCAM IS BETTER

100.    Samsara's deceptive and unfair business practices extend to falsely maligning independent third-party studies of dashcam products.  These studies, conducted by market leaders and trusted organizations, consistently demonstrate the superiority of Motive's AI Dashcam.

101.    In 2021, Motive commissioned Strategy Analytics, Inc.—now known as TechInsights—to perform an independent, objective, third-party comparison of the dashcams sold by Motive, Samsara, and another competitor in the market.  Strategy Analytics was and still is a respected product testing firm, and Motive had no prior relationship with the company.

102. The commission of such independent third-party studies is a common practice in the industry, and a way of helping to demonstrate to current and prospective customers the merits and value of competing products.

103. Strategy Analytics' testing occurred over the course of a year. Motive did not interfere with the testing and analysis; did not provide Strategy Analytics with any misleading parameters; and did not alter the results or findings of the testing. Instead, Motive asked Strategy Analytics to test key features that each company claimed its dashcam offered, including the ability to correctly and timely detect lack of seatbelt use, close following, and cell phone use. The Introduction to Strategy Analytics' Report is below:

## INTRODUCTION



- AI dash cams help prevent accidents by reducing distracted driving and other risky road behaviors. The cameras are mounted on the windshield and use artificial intelligence to detect unsafe driving behaviors and road conditions. Once detected, the cameras notify drivers with in-cab audio and visual alerts to help drivers modify their behaviors.

- Strategy Analytics undertook an independent evaluation of three leading AI dash cam providers (Motive, Lytx, and Samsara) on behalf of Motive. Strategy Analytics benchmarked performance across the following four criteria, which Motive has identified as essential when considering which AI dash cam to purchase:
  o Accuracy and speed of alerts
  o Image/video quality
  o Alerting style
  o Hardware design

- Strategy Analytics, Inc. is a global leader in supporting companies across their planning lifecycle through a range of syndicated and customized consumer and market research solutions. Strategy Analytics' multi-discipline capabilities include industry research advisory services, consumer insights, user experience design and innovation expertise, mobile consumer on-device tracking and business-to-business consulting competencies. Strategy Analytics has domain expertise in smart devices, connected cars, intelligent home, service providers, IoT, strategic components and media.

- This report covers the following:
  o AI Performance Evaluation and Methodology
  o Image and Hardware Quality Comparison and Methodology

104. In short, Motive sought to prove what it always believed, that its AI Dashcam performed better than two of its competitors, including Samsara. Motive was right. Strategy Analytics conducted 342 separate tests comparing Motive's product, the Motive DC-54, against Samsara's product, the Samsara HW-CM32, and the other competitor's product, as follows:



105. The dashcams were tested under varying driving conditions, such as the product's performance while driving during the dusk or evening. The products were compared across: accuracy and speed of alerts; image/video quality; alerting style; and hardware design. All dashcams were tested with their out-of-box settings, just as a customer would receive them; neither Strategy Analytics nor Motive altered or tampered with the products being tested. Strategy Analytics' methodology was clearly stated in its Report:

Complaint                                                          Case No.



106.     Motive's dashcam performed better than Samsara's in each category and was better-liked by users in the majority of categories.  Indeed, Strategy Analytics' tests supported the claims that Motive's AI Dashcam was the "best performing," "most accurate," and "fastest" as compared to its competitors.  As to Samsara's dashcam in particular, the testing showed that Samsara's claims in the marketplace about the capabilities of its product were false and grossly overstated, and that Samsara's dashcam was actually dangerous for users because it did not and could not detect a range of unsafe driver behaviors.

107.     Specifically, Strategy Analytics' overall test results demonstrated that Motive's AI Dashcam successfully detected unsafe driving behavior 89% of the time, as opposed to Samsara's dashcam, which detected unsafe driving only 15% of the time.

## SUMMARY RESULTS

**STRATEGY**ANALYTICS

The chart below shows the alert success rate and average time for alerts to trigger:

|  | # of Tests | Motive | Lytx | Samsara |
|---|---|---|---|---|
| **Overall** | **342** | **89% (9.5 sec)** | **61% (14.6 sec)** | **15% (20.4 sec)** |
| Texting | 69 | 100% (7.1 sec) | 100% (12.8 sec) | 14% (12.6 sec) |
| Phone call | 69 | 94% (11.0 sec) | 54% (14.0 sec) | 0% (n/a) |
| Phone in lap | 69 | 78% (10.5 sec) | 42% (18.0 sec) | 16% (13.8 sec) |
| Close following | 69 | 72% (11.8 sec) | 42% (7.2 sec) | 42% (26.0 sec) |
| Seat belt use | 66 | 98% (8.2 sec) | 68% (20.2 sec) | 5% (15.9 sec) |

108.   Motive's AI Dashcam also alerted drivers to modify their behavior much more quickly, on average, than Samsara's—thus preventing potentially dangerous accidents on the road.



## OVERALL SPEED

**STRATEGY**ANALYTICS

Average time to alert driver across all successful tasks combined

- Motive alerted the driver faster than Lytx and Samsara on average across all successful tasks
  - Motive took an average of 9.5 seconds to provide an alert
  - Lytx took an average of 14.6 seconds to provide an alert
  - Samsara took an average of 20.4 seconds to provide an alert

Complaint                                                                                          Case No.



109.   Motive posted the Strategy Analytics Report on its website in April 2022, so that consumers could see the truth about the capabilities of Motive's AI Dashcam, contrary to what Samsara had been falsely representing in the marketplace.

110.   Only after the Strategy Analytics Report became public did Samsara make a host of false allegations about Motive supposedly infringing Samsara's patents and competing unfairly, in an effort to extort Motive into withdrawing the Report and keeping the results from consumers.   Samsara falsely claimed that Strategy Analytics' test results were not reliable and were "rigged" to favor Motive.   Motive demonstrated to Samsara that the results were the result of rigorous, objective, independent analysis and that Samsara's criticisms were wrong—but also invited Samsara to jointly engage another respected third-party consultant to likewise test the companies' dashcams and see what the results were.   Samsara—knowing that its dashcam is inferior—refused.

111.   To confirm the validity of Strategy Analytics' test results, in 2023 Motive engaged the Virginia  Tech  Transportation  Institute  ("VTTI")  to  perform  another  independent,  third-party  study

Complaint                                                                                                                    Case No.

comparing the Motive DC-54; Samsara HW-CM32; and Lytx DriveCam SF400.  VTTI is one of Virginia Tech's centers of excellence and one of the nation's leading transportation research institutes.  Just as with the Strategy Analytics study, Motive did not interfere or tamper with the methodology or results of the study.

112.   VTTI's testing once again found that Motive's AI Dashcam was superior to Samsara's across multiple metrics.

113.   The study utilized both a first phase—the technical performance phase—and a second phase—the user performance phase.

114.   The first phase gauged how frequently each system issued an alert to the six driving behaviors using a controlled test-track experiment.  Those six different "driving events" were: 1) making an outgoing phone call, 2) texting mid-air on a cellphone (45-degree angle), 3) texting in the lap on a cellphone, 4) close following, 5) not wearing a seatbelt, and 6) rolling through a stop sign.

115.   The second phase involved recruiting 188 commercial vehicle drivers to provide ratings in an online survey about various qualities of the systems.

116.   At the end of this rigorous study, VTTI's results confirmed that Motive's AI Dashcam was the overall superior product:

The following conclusions highlight significant results from the two-phase study that pertain to the Motive system.

- Motive was more likely to issue a successful in-cab alert compared to Lytx and Samsara for phone call, lap texting, 45-degree texting, close following, and rolling stop trials across all lighting conditions.

- For Motive, *In-Cab Alert or Dashboard Alert* was the most frequent result for all tasks (phone calls, lap texting, 45-degree texting, close following, rolling stops, and no seatbelt).

- Motive had significantly shorter time to alert compared to Lytx for phone call tasks, 45-degree texting, and no seatbelt trials and significantly shorter time to alert for close following trials compared to Samsara.

- Motive was more likely to be ranked number one for daytime and nighttime video quality when compared to Lytx and Samsara.

- Motive was more likely to be ranked number one for nighttime image quality when compared to Samsara.

- Motive was more likely to be ranked number one for cell phone alert quality when compared to Lytx and more likely to be ranked first for close following alert quality when compared to both Lytx and Samsara.

- Motive had a significantly higher rating for hardware design when compared to Samsara.

117.    Samsara, not surprisingly, also refuses to accept the clear findings of the VTTI study, making a number of false and misleading statements about the study's methodology and results.  Yet Samsara still refuses Motive's challenge to conduct a joint study, or even to commission its own third-party study and publish the results.

118.    Motive is harmed by Samsara's false and misleading statements about these objective, independent reports.  On information and belief, such statements impeded Motive's ability to fairly compete in the marketplace and reduced Motive's sales to customers.  Motive must expend additional time, money, and resources in order to correct the public record, accurately inform the market, and fight back against Samsara's false and misleading statements.

## SAMSARA DEFAMES MOTIVE

119.    Samsara has extended its unethical, unlawful business practices into false public allegations about Motive and its senior executives.  Samsara has done so in order to try and prop up its own business

in the face of Motive's recent successes and the results of the independent Strategy Analytics and VTTI studies.

120.   On January 24, 2024, Samsara filed a lawsuit against Motive in federal court in Delaware containing numerous false allegations.  Motive, of course, denies these allegations and will respond to them at the appropriate time.  However, Samsara then used the filing of its suit to launch a public smear campaign against Motive, defaming Motive to customers and the market in general.

121.   Samsara created an entire new website devoted to spreading these false, misleading, and defamatory statements, which it launched on the day the lawsuit was filed.

122.   Among other things, Samsara's website states that Motive has committed "BRAZEN THEFT OF INTELLECTUAL PROPERTY" and engaged in "PERVASIVE FRAUD WITHIN LEADERSHIP TEAM," "A CULTURE BASED ON COPYING" and a "PATTERN OF THEFT."  All of these statements are false, and Samsara knew or should have known they were false. They also extend far beyond the allegations made in Samsara's pleadings, and hence are not protected by any litigation privilege.

123.   In fact, it is Samsara that has engaged in these activities, as shown by the facts described above.  In other words, Samsara is trying to distract from its own unethical and unlawful business practices by accusing Motive of engaging in the same or similar conduct.

124.   Samsara's defamatory statements—stating as fact on its website that Motive engaged in criminal conduct and other misconduct—cause Motive harm in the eyes of at least some customers or potential customers in the marketplace.

**SAMSARA TORTIOUSLY INTERFERES WITH MOTIVE'S CURRENT AND PROSPECTIVE CUSTOMER RELATIONSHIPS**

125.   Samsara also has used its false allegations in its lawsuit as a way to improperly interfere with Motive's current and potential customer relationships.  Samsara is of course free to file a lawsuit containing whatever allegations it chooses, which Motive will vigorously defend.  But what Samsara cannot do,

consistent with the law, is communicate those (false) allegations to companies whose business Motive is in the process of attempting to secure through open and honest competition.

126.  Before Samsara filed its Complaint, with the assistance of a large public relations firm (Edelman), it spent months creating a media smear campaign that it launched the day the lawsuit was filed. Part of the campaign was to create the defamatory website described above; another part was to send unsolicited communications to actual and potential Motive customers, urging them to access the new website and to read Samsara's false allegations.

127.  The purpose of Samsara's smear campaign was, among other things, to convince companies that were in the midst of considering purchasing Motive's products and services, based on the superiority of Motive's technology, to change their minds and not do business with Motive.

128.  One such company, Company 1, has a fleet of approximately 70 vehicles.  Company 1 contacted Motive in January 2024 to seek information about Motive's products and services.  Company 1 was also evaluating Samsara's products.  After learning of Samsara's false allegations, Company 1 cut off contact with Motive and refused to engage further.  On information and belief, Company 1 was informed by Samsara of Samsara's lawsuit and saw the Samsara website and the false and defamatory materials published on it, and that caused or substantially contributed to Company 1 not awarding a contract to Motive when it otherwise would have.

129.  Another such company, Company 2, has a fleet of approximately 1000 vehicles.  When a Motive sales rep recently contacted a representative of Company 2, the representative stated Company 2 wanted nothing to do with Motive, did not trust Motive, and was signing a contract with Samsara.  On information and belief, Company 2 was informed by Samsara of Samsara's lawsuit and saw the Samsara website and the false and defamatory materials published on it, and that caused or substantially contributed to Company 2 not considering Motive for a contract when it otherwise would have.

**SAMSARA FRAUDULENTLY CONCEALS ITS DECEIT**

130.   As described above, Samsara took steps to fraudulently conceal its access to, and copying of, Motive's technology and products.

131.   As detailed in paragraphs 1–21 and 43–52, Samsara's employees accessed Motive's platform on at least 30 occasions over at least six years.  This surreptitious access began in at least 2016, and the employees included some of the highest-ranking individuals at Samsara, such as its Vice President of Sales and Chief Product and Chief Strategy Officer.

132.   When creating accounts to access Motive's platform, users must provide their identifying information, such as their individual or company name, email address, and other identifying information.

133.   When Samsara's employees accessed Motive's platform, however, they either did not provide their actual names, or used phony company names, their personal email addresses, and/or inaccurate identifying information.

134.   On information and belief, Samsara employees used this illicit and fraudulent access to Motive's platform to steal and/or copy Motive's fleet management technology, platform capabilities and features, and business and marketing strategy, including to attempt to reverse-engineer the source code or underlying algorithms of the technology.

135.   Samsara took affirmative steps to conceal this unlawful scheme; it did so in part by providing the false identifying information to access Motive's platform, and on at least one occasion using a real company's DOT ID number.  By providing fake company names and other identifying information to Motive, Samsara concealed its illicit access to Motive's platform, and prevented Motive from identifying and halting this conduct.

136.   Because of the steps Samsara took to fraudulently conceal its unlawful access to Motive's platform, Motive was unable to uncover the ongoing fraud by Samsara for many years.

137.   Indeed, as described above, it was not until June and July of 2022 that Motive finally began to uncover and unravel Samsara's fraudulently concealed scheme.  Motive moved quickly to identify the fraudulently-concealed Samsara-employee accounts.  To do so, among other things, Motive searched publicly-available sources (e.g., LinkedIn) to identify the names of Samsara employees whose names matched or were similar to usernames or email addresses that had been used to register accounts on Motive's platform, searched for any Samsara email addresses associated with an account, and searched for names of Samsara employees who had applied to Motive or who had left Motive for Samsara.  Due to the Samsara employees' use of personal email addresses to conceal their connection to Samsara, the process was time consuming and required contributions from multiple Motive employees.

138.   Motive's investigation into Samsara's fraudulently concealed scheme is ongoing.  Because of the length of time for which Samsara was able to mask its access, Motive has had to expend substantial resources to review and analyze old records and data.  Motive must review older logs that have been archived, which requires rehydrating the data.  There is a cost to both rehydrate the data and to store it.

139.   On information and belief, further instances of Samsara's fraudulent concealment of its accounts and access to Motive's platform are yet to be uncovered.

### FIRST CAUSE OF ACTION
### (Infringement of the '580 Patent)

140.   Motive incorporates paragraphs 1–21 and 53–60 by reference as if fully set forth herein.

141.   Motive is the owner of all right, title, and interest in the '580 Patent and it possesses all rights of recovery under the '580 Patent, including the rights to sue for infringement, seek damages, and request injunctive relief.

142.   Samsara has infringed, and continues to infringe, one or more claims of the '580 Patent by making, using, selling, offering to sell, and/or importing in the United States products, including the

Infringing Products, that embody or otherwise practice one or more claims of the '580 Patent, including at least claim 1, literally and/or pursuant to the doctrine of equivalents.

143.    Claim 1 of the '580 Patent recites as follows:

*A method comprising:*

   *receiving, over a network from a camera device, a video comprising a set of image frames;*

   *identifying one or more lines in the video using a predictive model, the one or more lines including a horizon line;*

   *computing at least one camera parameter based on the one or more lines;*

   *overlaying the one or more lines on the video to generate an overlaid video;*

   *transmitting the overlaid video to an annotator device for manual review;*

   *receiving a confirmation from the annotator device, the confirmation indicating that the one or more lines are accurate; and*

   *transmitting data representing at least one camera parameter to the camera device.*

144.    The Infringing Products (including, without limitation, Samsara's CM31, CM32, and similar dashcams as well as its software-as-a-service platform) receive image and video data from dashcams and perform calibration of the dashcams via predictive models and user-control of such dashcams via a web-based portal and/or mobile application.

145.    By way of example, Samsara's Infringing Products meet each and every limitation of claim 1 of the '580 Patent as outlined in **Exhibit B**.

146.    Samsara's infringing activity took place in the United States, including, but not limited to, within this judicial district, in violation of 35 U.S.C. § 271.

147.    Samsara has targeted, and continues to directly target, the Infringing Products to residents of this judicial district, as well as elsewhere in and throughout the United States.

Complaint                                                                                                    Case No.

148.   Samsara has sold and offered for sale, and continues to sell and offer for sale, the Infringing Product to customers located in this judicial district, as well as elsewhere in and throughout the United States.

149.   Samsara has not sought or obtained from Motive a license under the '580 Patent, and it is not authorized or permitted to market, manufacture, use, offer for sale, sell, or import any products embodying the inventions disclosed and claimed in the '580 Patent.

150.   Samsara has caused Motive to suffer, and unless enjoined by this Court, will cause Motive to continue to suffer substantial injury, including lost profits, for which Motive is entitled to damages adequate to compensate it for Samsara's infringement.

151.   Samsara's infringement will continue to cause Motive irreparable injury and loss of revenues unless and until enjoined by this Court.

152.   Motive therefore seeks judgment as set forth in its Prayer for Relief for Samsara's infringement of the '580 Patent.

## SECOND CAUSE OF ACTION
### (Violation of Lanham Act, 15 U.S.C. § 1125(a))

153.   Motive incorporates paragraphs 1–21 and 87–99 by reference as if fully set forth herein.

154.   Motive and Samsara are direct competitors in the vehicle fleet management industry.

155.   Samsara's sales representatives provided Motive customers and prospective customers with the chart at paragraph 89, purporting to compare the Samsara and Motive product offerings, including their dashcams, and falsely claiming that Samsara's products could do things Samsara knew they could not, and that Motive's products could not do things that they could.

156.    On information and belief, Samsara has made other statements in connection with the sale of its dashcam and related products and services that similarly imply that Samsara's products have functionalities they do not, and Motive's products do not have functionalities that they do.

157.    Samsara's statements are each individually and collectively are literally false and are presumptively deceptive to customers.  If not literally false, Samsara's statements are each individually and collectively misleading and have the tendency to deceive a substantial segment of its audience into believing that Samsara's products have functionalities they do not, and that Motive's products do not have functionalities that they do.

158.    These false statements are each individually and collectively material, as they are likely to influence the purchasing decisions of customers in the vehicle fleet management market to purchase Samsara's products instead of Motive's because they are deceived into believing they will obtain certain functionalities through purchase of Samsara's products and will not obtain those functionalities through purchase of Motive's products.

159.    Samsara placed these statements in interstate commerce by providing them to customers and prospective customers across state lines, and because the Motive products and services that are the subject of Samsara's misrepresentations are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in, interstate and foreign commerce.

160.    Motive has faced and continues to face economic and reputational injury flowing directly from the deception wrought by Samsara's false advertising, including the direct diversion of customers and tarnishing Motive's industry reputation and goodwill.

161.    Because as a direct and proximate result of Samsara's false and deceptive campaign, Motive has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, Motive seeks injunctive relief to protect its legitimate business interests.

162.     As a direct and proximate result of Samsara's statements, Motive has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

163.     Samsara's false advertising was knowing and willful.

164.     This is an exceptional case within the meaning of Section 35 of the Lanham Act, 15 U.S.C. § 1117.

165.     Motive has been damaged by all of the foregoing and is entitled to injunctive relief and recovery of all available damages, treble damages, attorneys' fees, costs, and Samsara's profits.

### THIRD CAUSE OF ACTION
### (Fraud)

166.     Motive incorporates paragraphs 1–21 and 43–52 by reference as if fully set forth herein.

167.     As set forth in the chart at paragraph 9 and described above, Samsara employees, including senior executives such as Kiren Sekar, Samsara's Chief Product Officer and Chief Strategy Officer, Sean McGee, Samsara's Vice-President of Product Platform Infrastructure, and Rushil Goel, Samsara's (now former) VP of Products, created accounts on Motive's platform using fictitious company names and/or personal email addresses to defraud Motive into believing that they were actual customers of Motive.

168.     In at least one instance, Samsara employees used another company's DOT ID numbers, in furtherance of their efforts to defraud Motive into believing that these fictitious companies were actual companies that the Samsara employees were affiliated with.

169.     Samsara's employees knew that their representations regarding their identities and corporate affiliations were false and/or they intentionally concealed their true identities and affiliation with Samsara.

170.     Samsara's employees made these misrepresentations and/or concealed these facts at the direction of Samsara, and within the scope of their employment with Samsara, to induce Motive to rely on these misrepresentations and/or concealments such that Motive would grant them access to its platform and technology and divulge non-public, competitive information about Motive's products and business.

171.    Samsara had exclusive knowledge of its employees' identities and corporate affiliations.

172.    Samsara had a duty to disclose complete and accurate information about its employees' identities and corporate affiliations to Motive because Samsara actively concealed, or provided only partial and incomplete information, about their true identities by creating accounts using fictitious corporate affiliations, other companies' DOT ID numbers, and/or personal email addresses.

173.    Motive did in fact rely on Samsara's misrepresentations and/or concealment to grant Samsara access to Motive's platform and provide Samsara with non-public, competitive information about Motive's products and business, and such reliance was justifiable.  Had Motive known the true identities and corporate affiliations of the Samsara employees, Motive would not have granted them access to its platform or provided such information.

174.    Motive's reliance on Samsara's misrepresentations was a substantial factor in causing harm to Motive including, among other things, the loss of competitive information, as well as the expenditure of substantial time and resources of employees who conducted internal investigations regarding the existence of fictitious accounts, the Samsara employees associated with those accounts, and Samsara's unauthorized access of these accounts, ultimately requiring Motive to deactivate the accounts and terminate access.

175.    Motive is entitled to compensatory damages arising from Samsara's fraudulent conduct pursuant to Cal. Civ. Code § 1709 et seq. and common law.

176.    Because Motive did not discover the facts constituting the fraud due to Samsara's active concealment until June-July 2022, Motive may recover damages for conduct beyond three years before the filing of this Complaint.

## FOURTH CAUSE OF ACTION
### (Violation of California Unfair Competition Law, Cal. Civ. Code § 17200)

177.    Motive incorporates paragraphs 1–21, 43–52, 83–99, and 119–129 by reference as if fully set forth herein.

178.    Samsara engaged in unlawful, unfair, and fraudulent business acts and practices, as well as unfair, deceptive, untrue, or misleading advertising.  Such wrongful conduct includes without limitation Samsara's fraudulent access to Motive's Fleet Dashboard, use of false and misleading advertising in violation of the Lanham Act, defamation, and interference with prospective economic relations, as set forth above.

179.    In addition, such wrongful conduct includes Samsara's employees' impersonation of Motive employees in interactions with Motive's customers, as described in paragraphs 83–86.  On information and belief, such conduct is likely to deceive members of the public into believing that they are interacting with Motive employees when they are in fact interacting with Samsara's employees.  Indeed, on information and belief, such conduct in fact deceived a Motive customer into believing that a voicemail was from a Motive employee, only to learn upon calling back that the customer was actually interacting with a Samsara employee.

180.    This wrongful conduct constitutes Samsara's business practices, as such conduct was performed in connection with the sale of dashcams and related products and services.

181.    Motive has been injured and has lost money and property as a result of Samsara's false advertising, fraud, defamation, interference with prospective economic relations, and impersonation of Motive employees, including, but not limited to: lost current and prospective customers; loss of industry reputation and goodwill; lost profits; legal fees; and costs expended to mitigate the impact of Samsara's false statements.

182.    As a direct and proximate result of Samsara's wrongful conduct, Motive has sustained and will continue to sustain significant harm.  Motive is therefore entitled to (1) recover restitution, including without limitation all benefits that Samsara received as a result of its wrongful conduct, and (2) an injunction restraining Samsara from engaging in additional wrongful conduct.

183.    Because Motive did not discover the facts constituting certain of Samsara's unfair and fraudulent business practices due to Samsara's concealment until on or after June-July 2022, Motive may recover damages for conduct beyond four years before the filing of this Complaint.

### FIFTH CAUSE OF ACTION
**(Violation of California's Uniform Trade Secrets Act,
Cal. Civ. Code §§ 3426 to 3426.11)**

184.    Motive incorporates paragraphs 1–21 and 61–82 by reference as if fully set forth herein.

185.    Motive owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes specifications, designs, and customer lists that are essential to manufacture and sale of Motive's fleet management solutions and other products.

186.    These specifications, designs, and customer lists constitute trade secrets as defined by California's Uniform Trade Secret Act because they derive economic value from not being generally known to the public or other persons who could obtain economic value from their disclosure or use.

187.    Motive has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting electronic access to proprietary information, requiring employees to use company-provided computers, requiring employees to sign a Separation and Release agreement upon termination of their employment that reminds them of their confidentiality obligations, and performing exit interviews with employees who voluntarily depart.

188.    In violation of Motive's rights, Samsara misappropriated Motive's confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment of Motive employees with detailed knowledge of proprietary information to re-create Motive's dashcam, fleet management solutions, and other products, and (2) the recruitment of Motive employees with detailed knowledge of proprietary customer information.

189.    Samsara's conduct constitutes a misappropriation and misuse because Samsara knew or had reason to know that Motive's former employees disclosed the information without Motive's consent and while under a duty to maintain its secrecy, and induced them to do so.

190.    Samsara's misappropriation of Motive's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Samsara has attempted, and continues to attempt, to conceal its misappropriation.

191.    Samsara has not returned the information taken from Motive.  Upon information and belief, Samsara is retaining and using Motive's trade secrets and confidential information.

192.    As a direct and proximate result of Samsara's conduct, Motive has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

193.    In addition, because Motive has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, Motive seeks injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, Motive will continue to suffer irreparable injury, including in connection with Samsara's launch of its new dashcam.

194.    Motive has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Violation of Defend Trade Secrets Act,
### 18 U.S.C. §§ 1836 *et seq.*)

195.    Motive incorporates paragraphs 1–21 and 61–82 by reference as if fully set forth herein.

196.    Motive owns and possesses certain confidential, proprietary, and trade secret information, as alleged above.  This information includes specifications, designs, and customer lists that are essential to manufacture and sale of Motive's dashcam, fleet management solutions, and other products.

197.    These specifications, designs, and customer lists relate to products and services, including Motive's dashcam and fleet management solutions, that are used, sold, shipped, or ordered in, or intended to be used, sold, shipped, or ordered in interstate or foreign commerce.

198.    Motive's confidential, proprietary, and trade secret information derives economic value from not being generally known to, and not being readily ascertainable through proper means by, the public or other persons who could obtain economic value from the disclosure or use of the information.

199.    Motive has made reasonable efforts to maintain the confidentiality and secrecy of its proprietary information.  These efforts include training employees in the protection of corporate secrecy, requiring employees to sign confidentiality agreements, limiting electronic access to proprietary information, requiring employees to use company-provided computers, requiring employees to sign a Separation and Release agreement upon termination of their employment that reminds them of their confidentiality obligations, and performing exit interviews with employees who voluntarily depart.

200.    In violation of Motive's rights, Samsara misappropriated Motive's confidential, proprietary, and trade secret information through the improper and unlawful means alleged herein, including (1) the recruitment of Motive employees with detailed knowledge of proprietary information to re-create Motive's dashcam, fleet management solutions, and other products, and (2) the recruitment of Motive employees with detailed knowledge of proprietary customer information.

201.    Samsara's conduct constitutes a misappropriation and misuse because Samsara knew or had reason to know that Motive's former employees disclosed the information without Motive's consent and while under a duty to maintain its secrecy, and induced them to do so.

202.    Samsara's misappropriation of Motive's trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Samsara has attempted, and continues to attempt, to conceal its misappropriation.

203.    Samsara has not returned the information taken from Motive.  Upon information and belief, Samsara is retaining and using Motive's trade secrets and confidential information.

204.    As a direct and proximate result of Samsara's conduct, Motive has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

205.    In addition, because Motive has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, Motive seeks injunctive relief to protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.  Absent such relief, Motive will continue to suffer irreparable injury, including in connection with Samsara's launch of its new dashcam.

206.    Motive has been damaged by all of the foregoing and is entitled to an award of exemplary damages and attorneys' fees and costs.

### SEVENTH CAUSE OF ACTION
#### (Defamation)

207.    Motive incorporates paragraphs 1–21 and 119–124 by reference as if fully set forth herein.

208.    Since January 24, 2024, Samsara has intentionally published and intentionally continues to publish defamatory statements about Motive on Samsara's website.

209.    Those statements are false and carry false implications. Among other things, they falsely state and imply that Motive engaged in "brazen theft"; that there is a culture of "pervasive fraud" or "culture based on copying" within Motive; and that Motive engages in "deceptive marketing."

210.    By posting these statements on its website, Samsara communicated them to third parties including, among others, Motive's current and prospective customers, shareholders, and the general public. On information and belief, those third parties reasonably understood that these false statements concerned Motive, and such third parties further reasonably understood these false statements to mean that Motive had committed criminal, unethical, and/or immoral conduct in fact, and not merely as a matter of Samsara's opinion.

211.    Publication of these statements are not protected by any legal privilege.

212.    Motive is not a public figure.

213.    On information and belief, Samsara knows these statements are false and carry false implications. At minimum, Samsara has acted without using reasonable care to determine its truth or falsity or with reckless disregard as to the falsity of these statements.

214.    On information and belief, Samsara intended that these false statements would have the effect of injuring Motive's reputation, preventing others from doing business with Motive, and interfering with Motive's existing business relationships.

215.    Samsara's false statements have directly harmed Motive's business, property, and reputation in numerous ways, including, but not limited to: lost current or prospective customers; loss of industry reputation and goodwill; lost profits; legal fees; and costs expended to mitigate the impact of Samsara's malicious campaign.

216.    Samsara's publication of the false and defamatory statements cited herein have proximately caused Motive to suffer monetary damages in an amount to be determined at trial.

Complaint                                                                                                           Case No.

217.    Samsara's actions show willful misconduct, malice, fraud, wantonness, oppression or that entire want of care which would raise the presumption of conscious indifference to consequences.

218.    Because Samsara has engaged in conduct of a fraudulent and malicious nature, Motive is entitled to reputational and punitive damages.

219.    In addition, because as a direct and proximate result of Samsara's false statements, Motive has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, Motive seeks injunctive relief to protect its legitimate business interests.

220.    Motive has been damaged by all of the foregoing and is entitled to injunctive relief and recovery of all available damages, including presumed, general, specific, and punitive damages.

## EIGHTH CAUSE OF ACTION
### (Intentional Interference with Prospective Economic Relations)

221.    Motive incorporates paragraphs 1–21 and 125–129 by reference as if fully set forth herein.

222.    Samsara knowingly interfered with Motive's relationships with its current and prospective customers.

223.    For example, Samsara used its false and defamatory statements to undermine Motive's prospective economic relationship with Company 1 and Company 2.

224.    Upon information and belief, there was a high probability of future economic benefit to Motive in the form of a contractual relationship with Company 1 and Company 2.

225.    Samsara was aware of the prospective business relationship between Motive and Company 1 because it was directly competing for Company 1's business.  Samsara was aware of the prospective business relationship between Motive and Company 2 because it was directly competing for Company 2's business.

226.    Although Samsara was aware of these prospective economic relationships, Samsara published its defamatory statements with the intent to disrupt such relationships.

227.   This misconduct was independently wrongful as a violation of California common law.

228.   Samsara knew that this misconduct would result in a disruption in the prospective economic relationship between Motive and Company 1, and Motive and Company 2.

229.   Samsara's intentional misconduct has disrupted the prospective economic relationship between Motive and Company 1, and Motive and Company 2.

230.   As a direct and proximate result of Samsara's conduct, Motive has sustained and will continue to sustain significant harm and damages in an amount to be proven at trial.

231.   In addition, because Motive has sustained and will continue to sustain irreparable injury for which it has no adequate remedy at law, Motive seeks injunctive relief to restrain Samsara from engaging in additional intentional interference.  Absent such relief, Motive will continue to suffer irreparable injury.

## PRAYER FOR RELIEF

WHEREFORE, Motive respectfully requests the following relief:

a.   Judgment in Motive's favor and against Samsara on all causes of action alleged herein;

b.   Judgment that Samsara has infringed the '580 Patent;

c.   An injunction against Samsara, its subsidiaries, affiliates, parents, successors, assignees, officers, agents, servants, employees, and all persons acting in concert or in participation with them, or any of them, permanently enjoining each of them from infringing the '580 Patent;

d.   Judgment awarding Motive lost profit damages adequate to compensate for Samsaras' infringement of the '580 Patent, but in no event less than a reasonable royalty on Samsara's use of Motive's inventions;

e.   For damages in an amount to be further proven at trial, including trebling of all damages awarded with respect to the Second Cause of Action;

f.   For presumed, general, and special damages for Samsara's defamation;

g.   For disgorgement of profits for Samsara's false advertising;

h.   For permanent injunctive relief;

i.   For judgment that this is an exceptional case under the Lanham Act;

j.   For exemplary or punitive damages;

k.   For costs of suit incurred herein;

l.   For pre-judgment and post-judgment interest;

m.   For attorneys' fees and costs; and

n.   For such other and further relief as the Court may deem to be just and proper.

DATED:  February 15, 2024                GREENBERG TRAURIG, LLP
                                         WILLIAMS & CONNOLLY LLP

                                         By _/s/ David S. Bloch_____

                                         David S. Bloch

                                         Attorneys for Plaintiff
                                         MOTIVE TECHNOLOGIES, INC.

## DEMAND FOR JURY TRIAL

Pursuant to Civil Local Rule 3-6 and Federal Rule of Civil Procedure 38(b), Motive Technologies hereby demands a trial by jury on all issues and claims triable by jury.

DATED:  February 15, 2024                GREENBERG TRAURIG, LLP

                                         WILLIAMS & CONNOLLY LLP


                                         By _/s/ David S. Bloch_____
                                         David S. Bloch

                                         Attorneys for Plaintiff
                                         MOTIVE TECHNOLOGIES, INC.

Complaint                                                              Case No.