David S. Bloch (SBN CA 184530)
GREENBERG TRAURIG, LLP
101 Second Street, Suite 2200
San Francisco, California 94105-3668
Telephone:    415.590.5110
Facsimile:    415.707.2010
blochd@gtlaw.com

Kyle Chen (SBN CA 239501)
Yang Liu (SBN CA 319390)
GREENBERG TRAURIG, LLP
1900 University Avenue, 5th Floor
East Palo Alto, California 94303
Telephone:    650.328.8500
Facsimile:    650.328.8508

Joseph Petrosinelli (*pro hac vice*)
C. Bryan Wilson (*pro hac vice*)
Angela Pyo (SBN 337973)
Jack H. Danon (*pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:    202.434.5547
Facsimile:    202.434.5029
jpetrosinelli@wc.com
bwilson@wc.com
apyo@wc.com
jdanon@wc.com

Attorneys for Plaintiff
MOTIVE TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOTIVE TECHNOLOGIES, INC., a Delaware Corporation | CASE NO. 24-cv-00902-JD |
| Plaintiff, | |
| v. | **Declaration of David Znidarsic in Support of Claim Construction (Appendix B to Joint Claim Construction and Prehearing Statement Under P.L.R. 4-3)** |
| SAMSARA INC., a Delaware corporation. | |
| Defendant. | |

---

I, David Znidarsic, hereby declare as follows:

1.     I have been retained as an expert by Greenberg Traurig, LLP, counsel for Plaintiff Motive Technologies, Inc. (hereinafter, "Plaintiff" or "Motive") in the above-captioned case. I offer this declaration to explain how a person of ordinary skill in the art ("POSITA") would have interpreted the claim terms in dispute in this litigation ("Declaration").

2.     I reserve the right to submit additional materials related to my opinion about the construction of claims in this case, including without limitation a further declaration in support of Plaintiff' briefing on claim construction and/or a reply declaration responding to any expert declaration and/or testimony set forth by Defendant Samsara Inc. (hereinafter "Defendant" or "Samsara"). I also reserve the right to submit additional declarations in this matter in accordance with the case schedule and other applicable rules for discovery.

3.     If called as a witness, I could and would competently testify to all facts within my personal knowledge and about the opinions I render in this Declaration.

**Background and Qualifications**

4.     My qualifications and experiences are set forth in my CV in Exhibit A.

**Compensation**

5.     I am being compensated at the rate of $500 per hour for my work on this matter. My compensation in no way depends on the outcome of this proceeding, the content of my testimony, or any issues involved in or related to this proceeding.

**Materials Considered**

6.     In forming my opinions, I have relied upon my knowledge of the state of the art around the time of the priority-dates for the patents at issue (between 2015 and 2021). Additionally, I have reviewed the patents-in-suit, their file histories, the parties' Joint Claim Construction and Prehearing Statement, as well as other relevant materials produced and/or served by the parties in this case, and other publicly available information, as appropriate. A list of materials I considered in connection with this Declaration is attached hereto as Exhibit B.

**Legal Principles**

7.     I understand that claim construction is an issue of law for the Court. I also understand that before an infringement or validity determination can be made, the claims must be construed by the Court.

8.     I am informed that the words or phrases of a claim are generally given their plain and ordinary meanings that they would have had to a POSITA at the time of the invention. To determine the meaning of a claim term, I am informed that the Court will look first to the claims and specification, then to the file history, and only if necessary, to extrinsic evidence such as dictionaries and treatises. I also understand that limitations generally may not be imported from the specification or any embodiment(s) into the claims.

9.     It is my further understanding that the same words and phrases within a claim or claims are presumed to have the same meaning.  It is also my understanding that different words and phrases within a claim or claims are presumed to have different meanings.  Similarly, all words in a claim have meaning, and a word or phrase in a claim should not be interpreted to render other words or phrases in the claim superfluous.

10.    It is also my understanding that the POSITA is deemed to have read a disputed claim term or phrase being construed not only in the context of the particular claim in which the disputed term or phrase appears, but in the context of the entire patent, including the other claims, the specification, and the prosecution history.

11.    I also understand that an inventor can act as his or her own lexicographer.

**Level of Ordinary Skill in the Art**

12.    I understand that, to determine the appropriate level of skill of a POSITA, the following four factors may be considered: (a) the types of problems encountered by those working in the field and prior art solutions thereto; (b) the sophistication of the technology in question, and the speed with which innovations occur in the field; (c) the educational level of active workers in the field; and (d) the educational level of the inventor. I have been instructed that the level of ordinary skill in the art should

1  be determined at the time of the invention. I have been asked to presume that the relevant date for my

2  evaluation is between 2015 and 2021.

3       13.    The field of the patents-in-suit relates to multiple technologies: computer vision with

4  respect to vehicular systems, predictive models and their linear algebra origins, artificial intelligence and

5  its inference engine origins, remote control of devices over a network, database ETL (Extract,

6  Transform, Load) processes for data de-duplication, sensor measurement devices, and security,

7  authentication, and authorization of data communication. Based on my review and analysis of the

8  patents-in-suit and applying the considerations identified above as best they are known to me today, a

9  POSITA in the field of the patents-in-suit as of 2015 to 2021 would have (i) earned a bachelor's degree

10  in mathematics, computer science, or a similar engineering or science degree, and (ii) attained two or

11  more years of experience in a combination of the multiple technologies listed above. Alternatively, a

12  person with a more advanced degree in the above fields might have had less practical experience and

13  still be deemed a POSITA. Conversely, a person with a general college background not necessarily in

14  the above fields might also have become a POSITA by acquiring more real-world experience in

15  designing and/or implementing software and/or hardware components for computers, servers, and/or

16  other electronic devices.

17       14.    Under any of the definitions, I have the relevant experience and understanding of a

18  POSITA qualified to opine on interpretation of the many multiple technologies related to the patents-in-

19  suit, based on my following experience and education.

20       15.    Regarding computer vision with respect to vehicular systems, I was a testifying expert on

21  a patent litigation case between Motive and Omnitracs involving Motive's computer vision technologies

22  for 11 months, logging more than 500 hours. During that patent litigation case, I used and analyzed the

23  source code of a Motive AI Dashcam, a Motive Omnicam, a Motive Vehicle Gateway, Motive's iOS

24  and Android mobile apps, and Motive's Dashboard interface to its back-end servers. I was a forensic

25  software and firmware expert on a patent litigation case between Facebook and Blackberry involving

26  vehicular Electronic Logging Devices (ELDs) including vehicle gateways and asset gateways. During

27  that case, I used a Blackberry ELD device.

28

16.    Regarding predictive models and their linear algebra origins, I have a Bachelor's degree in Mathematics, with an emphasis in discrete mathematics, including linear algebra.

17.    Regarding artificial intelligence and its inference engine origins, I have a Master's degree in Computer Science with an emphasis in the Prolog programming language, where Prolog is one of the foundational programming languages of Artificial Intelligence, embodying a rule-based inference engine used in early Artificial Intelligence research. After receiving my Master's degree in Computer Science, I worked as a software development engineer and software development manager for 5 years at Quintus Computer Systems to produce and maintain a commercial compiler and runtime libraries for the Prolog programming language.

18.    Regarding remote control of devices over a network, I was a forensic software and firmware expert on multiple patent litigation cases involving remote control of devices over the Internet: the patent litigation case between Motive and Omnitracs, multiple patent litigation cases between Maxell and TCL involving remote control of televisions over a network, a patent litigation case between Entropic and Comcast involving remote control of television set top boxes, multiple patent litigation cases between Abbott and Dexcom involving remote control of medical devices, a patent litigation case between Touchstream and Comcast involving remote control of television set top boxes, multiple patent litigation cases between Google and Sonos involving remote control of home entertainment devices, and a patent litigation case between Chamberlain and Overhead Door involving remote control of residential and industrial door control systems.

19.    Regarding database ETL (Extract, Transform, Load) processes for data de-duplication, I was a Software Development Manager and Software Development Director at two database management technology companies: Informix and Ingres for a combined 10 years. I was a forensic software expert on multiple copyright cases between Oracle and Rimini Street, a patent litigation case between Commvault and Rubrik, a trade secret litigation case between MedImpact and IQVIA, and a trade secret litigation case between Zoho and Freshworks, all involving database management technologies.

20.     Regarding sensor measurement devices, I was a testifying expert in the patent litigation case between Motive and Omnitracs involving sensor measurements from dashcams and vehicle CAN buses, I was a forensic software and firmware expert on a patent litigation case between Facebook and Blackberry involving sensor measurements from dashcams and vehicle CAN buses, I was a forensic software and firmware expert on a patent litigation case between Chamberlain and Overhead Door involving sensor measurements from residential and industrial door control systems, and I was a forensic software and firmware expert on multiple patent litigation cases between Abbott and Dexcom involving sensor measurements from medical devices.

21.     Regarding security, authentication, and authorization of data communication, I was Information Security Officer, Technology Officer, and Vice President of Engineering for 16 years at Flexera / Macrovision, a company which protects intellectual property by controlling data communication between software applications using secure authentication and authorization methods.

22.     Exhibit A provides my full list of litigation case experience, corporate experience, and education.

I.     **SUMMARY**

The proposed constructions on which I am opining in this declaration are for claim elements in the following patents:

- U.S. Patent No. 11,875,580 (the '580 patent)
- U.S. Patent No. 12,136,276 (the '276 patent)
- U.S. Patent No. 11,975,685 (the '685 patent)
- U.S. Patent No. 12,069,041 (the '041 patent)
- U.S. Patent No. 10,033,706 (the '706 patent)

A.     **The '580 and '276 Patent Summaries**

23.     The '580 patent and the '276 patent both share the same specification, and both share the same title: "Camera Initialization for Lane Detection and Distance Estimation using Single-View Geometry".

**Declaration of D. Znidarsic in Support of Claim Construction**     **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

24.     The inventors of the '580 and '276 patents found a problem with prior art automotive systems for detecting objects on the road, which required use of "[m]ultiple cameras or sensors [that] may be installed in a vehicle to detect objects" ('580 at 1:10-11). The problem was that "use of multiple cameras" or proximity sensors "such as Radar and Lidar" was too expensive ('580 at 1:11-14). Instead, monocular cameras could provide a more cost-effective approach, but their use "require[d] the location of the camera to be predefined or preset" ('580 at 1:14-16).

25.     To address these deficiencies, the '580 and '276 patents describe various examples for "using a monocular camera (e.g., an image sensor) that may be retrofitted and adjustable within the vehicle such as, the vehicle's dashboard" ('580 at 1:21-23). To increase ease of use and avoid the need to have a predefined or preset camera location, the invention provides for "initializing such a camera onboard a vehicle" ('580 at 1:28-29). "Upon driving, the camera initializes itself to determine its height with respect to the ground as well as a road plane normal. Thus, the camera may be installed in various positions and later re-initialized or recalibrated as needed" ('580 at 1:24-27).

26.     Both patents are directed to using initial image frames recorded by a dashcam to detect artifacts in those initial recorded image frames which are used to calibrate the dashcam so it can more accurately estimate the distance of objects and detect lanes that appear in image frames recorded by the dashcam after it has been calibrated.

27.     The '580 patent is directed to a calibration method which uses one or more lines in the image frames of a video recorded by a camera device to calibrate that camera device. The '580 patent does this by "identifying one or more lines in the video using a predictive model", "computing at least one camera parameter based on those one or more lines", "overlaying the one or more lines on the video", "receiving confirmation indicating that the one or more lines are accurate", and "transmitting data representing the at least one camera parameter to the camera device".

28.     The '276 patent is directed to a calibration method which uses a horizon line detected in the image frames of a video recorded by a camera device to calibrate that camera device. The '276 patent does this by "detecting a horizon line in the image of a roadway" where the image is "recorded by a camera device installed in the vehicle", "overlaying a line on the image", giving the opportunity to

**Declaration of D. Znidarsic in Support of Claim Construction**          **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

modify the overlayed line so that it can be "a new line at a second position", "computing a camera parameter using the new line", and "transmitting data representing the camera parameter to the camera device".

29. The proposed constructions are for:

- claim element: "predictive model" referenced in '580,

- claim element: "camera parameter" referenced in '580 and '276,

- claim element: "an image of a roadway recorded by a camera device" referenced in '276,

- the order of steps referenced in claim 1 of '580

- the order of steps referenced in claims 1, 8, and 15 of '276

30. The '580 patent contains 3 independent and 17 dependent claims, all directed to the same method of calibrating a camera device by analyzing artifacts in initial image frames recorded by that camera device.

31. Motive is asserting claims 1-7 of the '580 patent. Below are the asserted claims from the '580 patent that contain the claim elements proposed for construction (highlighting added):

*1. A method comprising:*

***receiving, over a network from a camera device, a video comprising a set of image frames;***

***identifying one or more lines in the video using a predictive model, the one or more lines including a horizon line;***

***computing at least one camera parameter based on the one or more lines;***

***overlaying the one or more lines on the video to generate an overlaid video;***

***transmitting the overlaid video to an annotator device for manual review;***

***receiving a confirmation from the annotator device, the confirmation indicating that the one or more lines are accurate; and***

***transmitting data representing the at least one camera parameter to the camera device.***

*3. The method of claim 1, wherein computing the at least one **camera parameter** comprises predicting the at least one **camera parameter** using the **predictive model**.*

*4. The method of claim 1, wherein computing the at least one **camera parameter** comprises*

*predicting the at least one **camera parameter** using a second **predictive model**.*

*5. The method of claim 1, wherein the at least one **camera parameter** comprises a camera height and road plane normal.*

*6. The method of claim 1, further comprising:*

*receiving, over the network from the camera device, a second video comprising a second set of images;*

*transmitting the second video to the annotator device for manual review;*

*adding, by the annotator device, one or more lines to the second video to generate a second overlaid video;*

*predicting, using the one or more lines in the second overlaid video, at least one **camera parameter**; and*

*transmitting the at least one **camera parameter** to the annotator device.*

*7. The method of claim 6, further comprising:*

*receiving a second confirmation from the annotator device, the second confirmation indicating that the at least one **camera parameter** are accurate; and*

*transmitting data representing the one or more lines of the second video to the camera device.*

32.    The '276 patent contains 3 independent and 17 dependent claims, all directed to methods of calibrating a camera device by analyzing artifacts in initial image frames recorded by that camera device. Motive is asserting claims 1-20 of the '276 patent. Below are the asserted claims from the '276 patent that contain the claim elements proposed for construction (highlighting added):

*1. A method comprising:*

***receiving an image of a roadway recorded by a camera device installed within a vehicle;***

***detecting a horizon line in the image;***

***overlaying a line on the image to generate an overlaid image;***

***transmitting the overlaid image to a computing device over a network;***

***receiving a modification of the line from the computing device, the modification comprising a new line at a second position;***

1    *computing a camera parameter based on the new line; and*

2    *transmitting data representing the camera parameter to the camera device.*

3    *2. The method of claim 1, wherein the **camera parameter** comprises one of camera height,*

4    *viewing angle, and road plane normal.*

5    *7. The method of claim 1, wherein transmitting the data representing the **camera parameter** to*

6    *the camera device further comprises recomputing the **camera parameter** based on the modification*

7    *of the line.*

8    *8. A non-transitory computer-readable storage medium for tangibly storing computer program*

9    *that, when executed by a computer processor, perform operations of:*

10   *receiving an image of a roadway recorded by a camera device installed within a vehicle;*

11   *detecting a horizon line in the image;*

12   *overlaying a line on the image to generate an overlaid image;*

13   *transmitting the overlaid image to a computing device over a network;*

14   *receiving a modification of the line from the computing device, the modification*

15   *comprising a new line at a second position;*

16   *computing a camera parameter based on the new line; and*

17   *transmitting data representing the camera parameter to the camera device.*

18   *9. The non-transitory computer-readable storage medium of claim 8, wherein the **camera***

19   ***parameter** comprises one of camera height, viewing angle, and road plane normal.*

20   *14. The non-transitory computer-readable storage medium of claim 8, wherein transmitting the*

21   *data representing the **camera parameter** to the camera device further comprises recomputing the*

22   ***camera parameter** based on the modification of the line.*

23   *15. A device comprising:*

24   *a processor; and*

25   *a storage medium for tangibly storing thereon program logic for execution by the processor, the*

26   *program logic comprising logic for:*

27   *receiving an image of a roadway recorded by a camera device installed within a vehicle;*

28

**Declaration of D. Znidarsic in Support of Claim Construction**          **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

*detecting a horizon line in the image;*

*overlaying a line on the image to generate an overlaid image;*

*transmitting the overlaid image to a computing device over a network;*

*receiving a modification of the line from the computing device, the modification comprising a*
  *new line at a second position;*

*computing a camera parameter based on the new line; and*

*transmitting data representing the camera parameter to the camera device.*

   *20. The device of claim 15, wherein transmitting the data representing the **camera parameter** to the camera device further comprises recomputing the **camera parameter** based on the modification of the line.*

### B.    The '685 Patent Summary

   33.    The '685 patent, "Remote Vehicle Immobilizer," is directed to a system containing a client device which can remotely prevent a vehicle from starting even if the driver has the means to otherwise start the vehicle. The patent describes a remotely-controlled "electronic switch positioned within the vehicle in a conducting path between a starter motor of the vehicle and a battery of the vehicle."

   34.    The proposed constructions are for:

- claim element: "a conducting path between a starter motor of the vehicle and a battery of the vehicle".

   35.    The '685 patent contains 3 independent and 17 dependent claims, all directed to the same method of remotely preventing a vehicle from starting even if the driver has the means to otherwise start the vehicle.

   36.    Samsara is asserting claims 1-8 of the '685 patent. Below are the asserted claims from the '685 patent that contain the claim element proposed for construction (highlighting added):

   *1. A method comprising:*

   *receiving, from a client device and by one or more processors, a command to cause a change in a configuration associated with a vehicle; and*

-11-

*in response to the command, causing the vehicle to modify the configuration of an electronic switch from a first configuration to a second configuration, the electronic switch positioned within the vehicle in **a conducting path between a starter motor of the vehicle and a battery of the vehicle**, wherein the first configuration of the electronic switch is a closed configuration creating an uninterrupted conducting path, and the second configuration of the electronic switch is an open configuration creating an interrupted conducting path.*

### C.    The '041 Patent Summary

37.    The '041 patent, "Authentication of a Gateway Device in a Sensor Network," is directed to using a certificate to authorize whether devices can connect to each other in order that the devices can communicate data.

38.    The proposed constructions are for:

- claim element: "certificate".

39.    The '041 patent contains 6 independent and 24 dependent claims, all directed to the same method of using a certificate to authorize whether devices can connect to each other in order that the devices can communicate data.

40.    Samsara is asserting claims 16 and 18-20 of the '041 patent. Below are the asserted claims from the '041 patent that contain the claim element proposed for construction (highlighting added):

*16. A method in a management server, the method comprising:*

*in response to determining that a gateway device is associated with a wireless sensing device, generating a **certificate**;*

*transmitting the **certificate** to the gateway device during an initial connection with the gateway device, wherein the **certificate** is to be used for confirming that the wireless sensing device is authorized to connect with the gateway device; and*

*receiving data indicative of a plurality of sensor measurements, wherein the data was transmitted to the gateway device from the wireless sensing device in response to confirming based on the **certificate** that the wireless sensing device is authorized to connect with the*

Declaration of D. Znidarsic in Support of Claim Construction          Case No. 24-CV-00902-JD
ACTIVE 717956460v12

*gateway device.*

*18. The method of claim 16, wherein the **certificate** further includes a second identifier that matches an identifier of the wireless sensing device.*

### D. The '706 Patent

41.    The '706 patent, "Secure Offline Data Offload in a Sensor Network," is related to the '041 patent. They share most of the same specification and claim priority to the same provisional application (No. 62/263,563). ('706 patent) at (60); '041 patent at (60); compare '706 patent, Figs. 1-25D with '041 patent, Figs. 1-25D. Both patents are directed to "the field of sensor networks, and more specifically, to the secure offline data offload in a sensor network." '706 patent, 1:13-15; '041 patent, 1:22-24.

42.    The '706 patent is directed to communicating sensor measurements from a wireless sensing device to a first gateway device then communicating those same sensor measurements from the first gateway device to a management server device. The '706 patent is further directed to communicating sensor measurements from the wireless sensing device to a second gateway device, if there is a communication failure between the wireless sensing device and the first gateway device, then communicating those same sensor measurements from the second gateway device to the management server device. The '706 patent is further directed to the management server device removing any duplicate sensor measurements that may have been communicated to it by the first and/or second gateway devices. The '706 patent is further directed to the management server device identifying duplicate sensor measurements using the timestamp and sequence number assigned to each sensor measurement. The '706 patent is further directed to displaying the sensor measurements to the user after any duplicate sensor measurements have been removed. The sensor measurements are sent between the wireless sensing device, the gateway devices, and the management server device over secure communication channels. The patent describes each of these secure communication channels as the "first secure communication channel", "second secure communication channel", "third secure communication channel", and "fourth secure communication channel".

43.    The proposed constructions are for:

**Declaration of D. Znidarsic in Support of Claim Construction**                    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

- claim elements: "[first/second/third/fourth secure communication channel]",

- claim element: "a sequence number for each [sensor measurement]", and

- identifying the device in which the steps involving the removal of duplicates are performed and order in which those steps are performed on that device.

44.    The '706 patent has 2 independent and 10 dependent claims, all directed to the method of communicating sensor measurements, identifying duplicate sensor measurements, removing duplicate sensor measurements, and displaying sensor measurements in which duplicates have been removed.

45.    Samsara is asserting claims 1-6 of the '706 patent. Below are the asserted claims from the '706 patent that contain the claim elements proposed for construction (highlighting added):

*1. A method in a management server device for supporting secure offline data logging in sensor networks, wherein the sensor networks include a plurality of wireless sensing devices operative to detect physical events and to generate sensor measurements in response to the detection of the physical events, the method comprising:*

***receiving, upon establishment of a first secure communication channel between a first gateway device of a plurality of gateway devices and the management server device, data indicative of a first plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each,***

*wherein the data was transmitted to the first gateway device from a first wireless sensing device of the plurality of wireless sensing devices over a **second secure communication channel** between the first gateway device and the first wireless sensing device,*

*and wherein the management server device tracks which of the plurality of gateway devices and which of the plurality of wireless sensing devices is associated with which of a plurality of organizations,*

***receiving, upon establishment of a third secure communication channel between a second gateway device of the plurality of gateway devices and the management server device, data indicative of a second plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each,***

Declaration of D. Znidarsic in Support of Claim Construction                                    Case No. 24-CV-00902-JD
ACTIVE 717956460v12

*wherein the data was transmitted to the second gateway device from the wireless sensing device through a **fourth secure communication channel** between the second gateway device and the wireless sensing device following disconnection of the **second secure communication channel** between the first gateway device and the wireless sensing device;*

*reconciling the data indicative of the first plurality of sensor measurements and the data indicative of the second plurality of sensor measurements based on the sequence numbers and the time stamps to generate reconciled sensor measurements in which duplicates have been removed; and*

*providing for display a user interface including a representation of the reconciled sensor measurements over time.*

*4. The method of claim 1 further comprising:*

*establishing the **first secure communication channel** between the first gateway device and the management server device based on a first pair of private and public keys of the first gateway device and a second pair of private and public keys of the management server device.*

*5. The method of claim 4 further comprising:*

*establishing the **third secure communication channel** between the second gateway device and the management server device based on a third pair of private and public keys of the first gateway device and the second pair or private and public keys of the management server device.*

*6. The method of claim 1, wherein the second gateway device and the first gateway device are the same gateway device, and wherein the **second secure communication channel** is established following a disconnection of the **first secure communication channel** between the wireless sensing device and the first gateway device.*

**Declaration of D. Znidarsic in Support of Claim Construction**                                    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

**Construction of Disputed Claim Elements**

46.     Each of the following sections identifies one of the disputed claim elements and includes my opinion about the constructions proposed by Motive and by Samsara for that claim element.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|-----------|---------------|-------------------------------|--------------------------------|
| Motive's '580 claims 1 and 3-7; and '276 claims 1, 2, 7, 8, 9, 14, 15, and 20 | "camera parameter" | "value(s) associated with one or more operating characteristics of a camera" | "property of the camera itself" |

47.     Motive is proposing a claim construction for "camera parameter" based on language in the '580 specification, while Samsara is restricting the term to only "property of the camera itself" despite the contrary language in the claims and the specification.

48.     As an initial matter, nothing in the patent limits a "camera parameter" to be an "intrinsic parameter". To the contrary, the specification common to both '580 and '276 gives examples of "extrinsic camera parameters". Exemplary "extrinsic camera parameters" provided by the specification are:

- height of the camera (1:37, 1:50, 4:35, 6:54, 11:26, Claim 2 and 9)
- viewing angle of the camera relative to the roadway (1:38, 1:50, 4:35, 11:26, Claim 2 and 9)
- ground plane normal vector (1:39)
- road plane normal vector (1:39, 1:50-51, 4:35, 11:26-27, Claim 2 and 9)
- IPM (Inverse Perspective Mapping) (6:54)

49.     Furthermore, neither the specification nor the claims of '580 or '276 mention "intrinsic camera parameters" like focal length, principal point, or lens distortion.

50.     Therefore, Samsara's proposal that "camera parameter" which appears to be limited to only "intrinsic camera parameters" is not applicable to the '580 and '276 patents.

-16-

**Declaration of D. Znidarsic in Support of Claim Construction**                **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

51. For this claim element, a POSITA would have understood it to mean "value(s) associated with one or more operating characteristics of a camera", because it does not exclude either "extrinsic camera parameters" or "intrinsic camera parameters" like Samsara's proposed construction does.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Motive's '580 | Steps of '580 claim 1 | Plain and ordinary meaning | Step [b] must be performed after step [a]<br>Step [c] must be performed after step [b]<br>Step [d] must be performed after step [b]<br>Step [e] must be performed after step [d]<br>Step [f] must be performed after step [e]<br>Step [g] must be performed after steps [c] and [f] |

52. For the steps of '580 claim 1, Motive is proposing the plain and ordinary meaning for the order of its steps, while Samsara is proposing a specific order of its steps.

53. Firstly, Samsara has not provided evidence which explains which aspects of the steps cause the dependency that they propose.

54. Secondly, neither the other claims of '580 nor its specification imposes these dependencies. Therefore, the only evidence for these dependencies would have to come from the language of claim 1 itself.

55. For example, Samsara proposes that step [g] must be performed after both steps [c] and [f]. However, the language of claim 1 does not support such a dependency as proposed. Here is the language of both steps [f] and [g]:

- Step [f]: "receiving a confirmation from the annotator device, the confirmation indicating that the one or more lines are accurate"

- Step [g]: "transmitting data representing the at least one camera parameter to the camera device"

**Declaration of D. Znidarsic in Support of Claim Construction**          Case No. 24-CV-00902-JD
ACTIVE 717956460v12

56.    There is no element in step [g] that is dependent upon an element in step [f]. For example, step [g] does not require anything from step [f] to do its "transmitting … to the camera device" or for "data representing the at least one camera parameter". Furthermore, step [f] only mentions "a confirmation" and "the annotator device", and neither a confirmation nor the annotator device are used in step [g].

57.    The only mentions in the specification of a dependency between "receiving a confirmation from the annotator device, the confirmation indicating that the one or more lines are accurate" (step [f]) and "transmitting data representing the at least one camera parameter to the camera device" (step [g]) are within Samsara's broad citations of 1:36-2:8 and 5:21-7:10:

- at 1:50-52 – "*Once the horizon line is confirmed, the system returns the camera parameters to the calling party (e.g., a camera onboard a vehicle).*"

  - However, the paragraph in which this statement is made starts with the phrase "In a first embodiment, …", and the next two paragraphs start with the phrases "In a second embodiment, …" and "In a third embodiment, …". Therefore, this dependency is only mentioned in an embodiment.

- at 6:5-10 – "*If the annotator confirms the overlaid lines, the annotator can accept the lines and transmit its acceptance back to the camera initialization service 232 in transmission 222. In response, the camera initialization service 232 can then transmit the generated camera parameters back to the device 230 in transmission 224.*"

  - However, the paragraph in which this statement is made starts with the phrase "In an embodiment, …". Therefore, this dependency which describes Figs 2 is only mentioned in an embodiment.

- at 7:1-4 – "Alternatively, if the annotator confirms that the horizon and/or camera parameters are accurate, the annotator device 234 can transmit the camera parameters to the camera initialization service 232 in transmission 226"

  - However, this statement is made in a paragraph that is preceded by the phrase "In one embodiment, …". Therefore, this dependency which describes Fig. 2 is only mentioned in an embodiment.

58.    Therefore, step [g] is not dependent on step [f].

-18-

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Motive's '580 claims 1, 3, and 4 | "predictive model" | "model that predicts values using non-geometric calculation" | "a deep learning or other AI model trained to identify the one or more lines" |

59.  Motive is proposing a claim construction for "predictive model" supported by the '580 patent's claim language, specification, and prosecution history, as well as by extrinsic evidence, while Samsara is proposing a claim construction that adds limitations that a POSITA would not recognize as being required for the term.

60.  I first looked at the claims and specification of '580 to determine whether its "predictive model" is limited to identifying (i.e., predicting) only "one or more lines". Here are all the references in the '580 patent claims that relate to the type of outcomes that can be predicted using the "predictive model" (highlighting added):

1[b]. ***identifying one or more lines*** *in the video **using a predictive model**, the one or more lines including a horizon line;*

3. *The method of claim 1, wherein computing the at least one camera parameter comprises **predicting the at least one camera parameter using the predictive model**.*

4. *The method of claim 1, wherein computing the at least one camera parameter comprises **predicting the at least one camera parameter using a second predictive model**.*

1:39-40 – "***identifies one or more lines*** *in the video **using a predictive model**"*

4:29-31 – "***predictive models*** *(e.g., as depicted in FIGS. 3 A and 3B) **to generate camera parameters**"*

5:26-27 – "***detects lane and horizon lines*** *in the video **using a predictive model**"*

5:29-31 – "*a **predictive model**, such as a CNN or other type of deep learning model **to identify lane and horizon markers**"*

61.  Even though claim 1 and two passages from the specification use a "predictive model" to predict lines, claims 3 and 4 and one passage from the specification use a "predictive model" to predict a

"camera parameter", and one passage from the specification uses a "predictive model" to predict "lane and horizon markers". The claims and specification of '580 do not limit the outcome of a "predictive model" to be only "one or more lines".

62.     Therefore, Samsara's proposed construction in which a "predictive model" can only "identify the one or more lines" is unnecessarily limiting.

63.     I next looked at the claims and specification of '580 to determine whether or not its "predictive model" is limited to a trained model. Here is my analysis of all the references to "train", "trained", "training", and "trainable" in the '580 patent.

64.     The only claims that reference "train", "trained", "training", or "trainable" in the '580 patent are independent claim 17 and one of its dependent claims 18. Claim 17 describes a trained "estimation head" and claim 18 describes a trained "prediction head". However, neither claim references a "predictive model", as is done in claim 1, 3, and 4. The following are the relevant passages from claims 17 and 18 (highlighting added):

> 17[d]. *predicting at least one camera parameter using the camera parameter estimation head, the **camera parameter estimation head trained** using an output of the backbone network and an output of a lane and horizon line prediction head.*

> 18. *The method of claim 17, wherein the backbone network, camera parameter estimation head, **lane and horizon line prediction head are trained** using a joint loss function, the joint loss function aggregating the losses of the lane and horizon line prediction head and the neural network.*

65.     The following reference to "trained" is made in the third of three embodiments listed in the specification from 1:36-2:8. This is the exact same language used in the unasserted claim 17 that does not reference a "predictive model", and this exact same language is used in claim 17, implying that claim 17 and its dependent claims, including its dependent claim 18 relate to the third embodiment at 1:65-2:8.

- *"**camera parameter estimation head trained** using an output of the backbone network"* (2:5-7)

66.     Furthermore, the following references to "train", "trained", "training", or "trainable" in the specification of the '580 patent are related to FIG. 4A and FIG. 4B, where FIG. 4A and FIG. 4B are not related to a "predictive model":

- *"FIG. 4A is a flow diagram illustrating a method for **training the neural network**"* (2:27:29)

- *"FIG. 4B is a flow diagram illustrating a method for **training the neural network**"* (2:30-33)

- *"FIG. 4A is a flow diagram illustrating **a method for training the neural network** of FIG. 3A according to some embodiments."* (9:60-62)

- *"In one embodiment, the stopping criterion can comprise a configurable parameter **set during the training of the machine learning (ML) model**"* (10:34-36)

- *"In step 412A, if the method determines that the stopping criterion is not met, the method will compute partial derivatives against all trainable network parameters and back-propagates them to adjust each layer parameter, as described previously."* (10:45-49)

- *"FIG. 4B is a flow diagram illustrating a method for **training the neural network** of FIG. 3B according to some embodiments*."* (10:59-61)

- *"In step 410B, the method determines if a stopping criterion is met. In one embodiment, the stopping criterion can comprise a configurable parameter set during the **training of the ML model**."* (11:37-40)

- *"In step 412B, if the method determines that the stopping criterion is not met, the method computes partial derivatives against all **trainable network parameters** and back-propagates them to adjust each layer parameter, as described previously".* (11:49-53)

- *"FIG. 8 is a block diagram of a computing device according to some embodiments of the disclosure. In some embodiments, the computing device can be used to **train** and use the various ML models described previously".* (16:24-27)

  o   This quote, while not within the descriptions of FIG. 4A and FIG. 4B, reference the training described in FIG. 4A and/or FIG. 4B.

67.     The above references do not even provide an example in which a "predictive model" is required to be trained. Furthermore, the predictive model referenced in the '580 patent uses a non-geometric calculation based on the specification of the '580 patent and its prosecution history, as follows.

**Declaration of D. Znidarsic in Support of Claim Construction**                                        **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

68.     The specification of the '580 patent explains that the disclosed "[s]ystems can use the illustrated neural network in some embodiments **instead of a geometric process** to determine lane and horizon lines" ('580 at 7:14-16), and furthermore explains that "since the model is capable of predicting the horizon line directly, previous requirements of having three lane lines in frame **(e.g., to geometrically calculate a horizon line) can be relaxed**" ('580 at 8:39-46, with highlighting added).

69.     Claims 1-3, 5, 8-12, and 14-15 were rejected as being unpatentable over U.S. Pub. No. 2019/0034740 ("Kwant1") and U.S. Pub. No. 2019/0102674 ("Kwant2"); see File History of U.S. Patent No. 11,875,580 ("EX1002") at 0131.

70.     In response to the rejection, the applicants noted that Kwant1's predictive model does not predict a horizon, but instead only predict lane lines:

> "*Kwant1 does not disclose using a predictive model to detect a horizon line. Instead, Kwant1describes predicting lane lines. Kwant1then describes extending these lane lines and, using a geometric approach, identifying the horizon line. Kwant1only describes using predictive modeling to predict lane lines. Thus, Kwant1 does not describe predicting a horizon line as claimed*" (EX1002 at 0145-0146).

71.     The examiner of the '580 patent's application allowed claims 1-20 after concluding that a particular feature "is not found or suggested in the prior art" (EX1002 at 0171). One element of that particular feature is "identifying one or more lines in the video using a predictive model, the one or more lines including a horizon line" (EX1002 at 0171).

72.     Earlier in his allowance (EX1002 at 0170), the examiner noted that the passage from Kwant1 which the examiner had earlier considered as prior art for the application's "the one or more lines including a horizon line" claim element was the following passage from Kwant1: "determining a horizon line in the image at which a maximum number of the one or more extended road lanes crosses over a minimum horizontal extent of the horizontal line" (EX1002 at 1070). A POSITA at the time '580 was issued would understand that is passage from Kwant1 describes a geometric calculation; that is, extending road lane lines until they cross.

73.     By allowing claims 1-20, the examiner concluded that Kwant1's predictive model geometric calculation of a horizontal line is not prior art for the '580 patent application's predictive model calculation of a horizon line. Based on this distinction by the examiner, I have concluded that the '580 patent's predictive model does not include geometric calculations. If the '580 patent's predictive model did include geometric calculations, the patent examiner would have continued to consider Kwant1's predictive model geometric calculation as prior art to the '580 patent application's predictive model.

74.     Because the "predictive model" of '580 is limited to non-geometric calculations, is not limited to identifying one or more lines, and is not limited to a trained model, a POSITA would have understood "predictive model" to mean "model that predicts values using non-geometric calculation".

75.     A POSITA would understand that the terms "prediction", "predictive model", and "predictive modeling" were related to the term "prediction" used in the machine learning (ML) community and to some degree the term "inference", used in statistics. A POSITA would understand that the terms "infer" and "inference" are also used by the ML community in relation to "predict" and "prediction".

76.     Because a "predictive model" is related to statistics, a POSITA would understand that a statistical calculation is not a geometric calculation. For example, in the following, "predictive modeling" is defined as a "statistical technique" (https://www.qlik.com/us/predictive-analytics/predictive-modeling), with highlighting added:

> "**Predictive modeling is a statistical technique** used to predict the outcome of future events based on historical data. It involves building a mathematical model that takes relevant input variables and generates a predicted output variable."

77.     In the following, a "predictive model" is defined as being "based on inferential statistics". Furthermore, "predictive model" is defined independently of artificial intelligence, such that the "development of artificial intelligence" is generating "great advances" in "predictive models" (https://www.arimetrics.com/en/digital-glossary/predictive-model):

### What is Predictive Model

**Definition:**

The **predictive model** is a data model, based on inferential statistics, that is used to predict the response to a marketing promotion or a certain investment.

The predictive model is commonly created by <u>data scientists</u> and uses statistics to predict outcomes. Most of the time the event one wants to predict is in the future, but predictive modeling can be applied to any type of unknown event, regardless of when it occurred.

In many cases the model is chosen on the basis of detection theory to try to guess the probability of an outcome given a set amount of input data, for example, by giving an email to determine the probability that it is spam.



Predictive model

Models can use one or more classifiers when attempting to determine the probability of a set of data belonging to another set. When deployed commercially, predictive modeling is often referred to as predictive analytics.

### The predictive model in marketing

Although predictive models are applicable in different areas, it is in the field of <u>digital strategy</u> where great advances are being generated due to the emergence of Business Intelligence tools and the development of artificial intelligence. More and more work is being done on models that allow predicting, based on what has happened, what will happen in the future. All this has direct application in marketing campaigns, with the aim of knowing how they will work even before they have been launched.

78.     The following is the abstract of a document which references an earlier comparison between statistics (i.e., "the data modeling culture") and machine-learning (i.e., "algorithmic modeling culture"), with highlighting added:

> *Two decades ago, Leo Breiman identified two cultures for statistical modeling. The **data modeling culture** (DMC) refers to practices aiming to conduct **statistical inference** on one or several quantities of interest. The **algorithmic modeling culture** (AMC) refers to practices defining a **machine-learning** (ML) procedure that generates accurate predictions about an event of interest. Breiman argued that statisticians should give more attention to AMC than to DMC, because of the strengths of ML in adapting to data. While twenty years later, DMC has lost some of its dominant role in statistics because of the data-science revolution, we observe that this culture is still the leading practice in the natural and social sciences. DMC is the modus operandi because of the influence of the established scientific method, called the hypothetico-deductive scientific method. Despite the incompatibilities of AMC with this scientific method, among some research groups, AMC and DMC cultures mix intensely. We argue that this mixing has formed a fertile spawning pool for a mutated culture that we called the **hybrid modeling culture** (HMC) where **prediction and inference have fused** into new procedures where they*

*reinforce one another. This article identifies key characteristics of HMC, thereby facilitating the scientific endeavor and fueling the evolution of statistical cultures towards better practices. By better, we mean increasingly reliable, valid, and efficient statistical practices in analyzing causal relationships. In **combining inference and prediction**, the result of HMC is that **the distinction between prediction and inference, taken to its limit, melts away**. We qualify our melting-away argument by describing three HMC practices, where each practice captures an aspect of the scientific cycle, namely, ML for causal inference, ML for data acquisition, and ML for theory prediction.* (https://arxiv.org/abs/2012.04570 referencing Leo Breiman who wrote https://projecteuclid.org/euclid.ss/1009213726 )

79.     Thus, a POSITA would not understand a predictive model in the context of the '580 patent to include any geometric calculations.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Motive's '276 claims 1, 8, and 15 | Steps of '276 claims 1, 8, and 15 | Plain and ordinary meaning | Step [b] must be performed after step [a]<br>Step [c] must be performed after step [b]<br>Step [d] must be performed after step [c]<br>Step [e] must be performed after step [d]<br>Step [f] must be performed after step [e]<br>Step [g] must be performed after step [f] |

80.     For the steps of '276 claims 1, 8, and 15, Motive is proposing the plain and ordinary meaning for the order of its steps, while Samsara is proposing a specific order of its steps.

81.     Firstly, Samsara has not provided evidence which explains which aspects of the steps cause the dependency that they cite.

82.     Secondly, neither the other claims of '276 nor its specification imposes these dependencies. Therefore, the only evidence for these dependencies would have to come from the language of claim 1 itself.

83. For example, Samsara proposes that step [c] must be performed after step [b]. However, the language of claim 1 does not require such a dependency. Here is the language of both steps [b] and [c], which are identical for claims 1, 8, and 15:

- Step [b]: "*detecting a horizon line in the image*"

- Step [c]: "*overlaying a line on the image to generate an overlaid image*"

84. There is no element in step [c] that is dependent upon an element in step [b]. For example, step [c] does not require anything from step [b] to "generate an overlaid image". That is, step [c] only requires "overlaying **a** line" (highlighting added), not necessarily the "horizontal line" detected in step [b]. Furthermore, step [c] does not even require that the line it is "overlaying" to be a horizontal line.

85. The only mentions in the specification of a dependency between "*detecting a horizon line in the image*" (step [b]) and "*overlaying a line on the image to generate an overlaid image*" (step [c]) are within Samsara's broad citations of 1:36-2:8 and 5:21-7:10:

- at 1:51-52 – "T*he system then overlays the computed horizon line on the video.*"

    - However, the paragraph in which this statement is made starts with the phrase "In a first embodiment, …", and the next two paragraphs start with the phrases "In a second embodiment, …" and "In a third embodiment, …". Therefore, this dependency is only mentioned in an embodiment.

- at 5:56-58 – "*process 206 overlays the computed lane and horizon lines on the original video file, generating an overlaid video file.*"

    - However, the paragraph in which this statement is made starts with the phrase "In an embodiment, …". Therefore, this dependency which describes Figs 2 is only mentioned in an embodiment.

- at 5:61-62 – "*process 206 can only overlay a horizon on the original video file as part o f generating an overlaid video file.*"

**Declaration of D. Znidarsic in Support of Claim Construction**          **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

○ However, the paragraph in which this statement is made starts with the phrase "In an embodiment, …". Therefore, this dependency which describes Figs 2 is only mentioned in an embodiment.

86.    Therefore, step [c] is not dependent on step [b].

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Motive's '276 claims 1, 8, and 15 | "an image of a roadway recorded by a camera device" | "a video, or video frames [of a roadway recorded by a camera device]" | Plain and ordinary meaning |

87.    Motive is proposing a claim construction for "an image of a roadway recorded by a camera device" based on how the term is defined in the '276 specification. The specification includes the following sentence which, despite their sometimes multi-column citations, Samsara neglects to cite as evidence (10:14-15, 11:12-13, 12:20-21, 12:50-51 in the '276 specification): "the image or set of images can comprise a video or video frames". This definition means the following four statements:

- the image can comprise a video
- the image can comprise video frames
- the set of images can comprise a video
- the set of images can comprise video frames

88.    The first two of these statements from the specification are consistent with Motive's proposed claim construction.

89.    Furthermore, the specification uses the term "image frames", implying that an "image" (singular) comprises "frames" (plural); see Abstract, 1:45, 1:62, 2:7, 4:17, and 15:60.

For the definition of "an image of a roadway recorded by a camera device", a POSITA would have understood it to mean "a video, or video frames [of a roadway recorded by a camera device]" in the context of the '276 patent.

Declaration of D. Znidarsic in Support of Claim Construction                Case No. 24-CV-00902-JD
ACTIVE 717956460v12

90.    Claim 3 recites the method of claim 1, claim 10 recites storage medium of claim 8, and claim 16 recites the device of claim 15. Claims 3, 10, and 16 each state "wherein receiving the image of the roadway comprises receiving an image of the roadway while the vehicle is moving". This repeated statement which describes that the "vehicle is moving" makes clear that the recited "image" in claims 1, 8, and 15 is a "video, or video frames" as proposed by Motive.

91.    Claim 4 recites the method of claim 3, claim 11 recites the storage medium of claim 10, and claim 17 recites the device of claim 16. Claims 4, 11, and 17 each state "wherein receiving the image of the roadway while the vehicle is moving comprises detecting that the vehicle is traveling above a pre-defined speed or for a pre-defined duration". This repeated statement which describes that the "vehicle is traveling a pre-defined speed or for a pre-defined duration" further makes clear that the recited "image" in claims 1, 8, and 15 is a "video, or video frames" as proposed by Motive.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Samsara's '041 claims 16 and 18 | "certificate" | "a digital document including data plus a digital signature generated by the management server based on the data and private key of the management server" | Plain and ordinary meaning |

92.    Motive is proposing a claim construction for "certificate" under its plain and ordinary meaning in the context of the '041 specification.

93.    Even within the broad citation used by Samsara for its proposed construction of plain and ordinary meaning (21:54-22:15), there is a sentence which is consistent with Motive's proposed construction (highlighting added):

- 21:56-58 – *"The certificate includes data and **a digital signature on the data generated with the private key of the management server**"*

94.    Furthermore, within another broad citation used by Samsara for its proposed construction of plain and ordinary meaning (23:48-62), there are two additional sentences which are consistent with Motive's proposed construction (highlighting added):

- at 23:50-51 – "*The certificate was **generated by the management server***"

- at 23:52-55 – "*The certificate is a **digital document including data and digital signature**, where the digital signature was **generated by the management server***"

95.    Note that the paragraphs which include these sentences are not identified as an embodiment.

96.    A POSITA at the time of the '041 patent's issuance would understand a "certificate" a defined in the specification to be an X.509 digital security certificate.

97.    An official web site the United States government, hosted by the National Institute of Standards and Technology (NIST), contains a glossary that provides 12 alternative definitions of a certificate (https://csrc.nist.gov/glossary/term/certificate). Eleven of these definitions requires a certificate to be "digitally signed" and one of these definitions requires a certificate to contain a "signature". One of these defines a certificate to be a "digital document", while others define a certificate to be a "set of data", a "digital representation of information", and a "data structure". Three of these defines a certificate to be associated with a "private key".

98.    Here are each of those definitions (highlighting added):

- "*A **set of data** that uniquely identifies a public key (which has a corresponding **private key**) and an owner that is authorized to use the key pair. The certificate **contains** the owner's public key and possibly other information and **is digitally signed** by a Certification Authority (i.e., a trusted party), thereby binding the public key to the owner.*"

- "*A **set of data** that uniquely identifies a public key that has a corresponding **private key** and an owner that is authorized to use the key pair. The certificate **contains** the owner's public key and possibly other information and **is digitally signed** by a certification authority (i.e., a trusted party), thereby binding the public key to the owner.*"

- *"A **digital representation of information** which at least (1) identifies the certification authority (CA) issuing it, (2) names or identifies its subscriber, (3) **contains** the subscriber's public key, (4) identifies its operational period, and (5) **is digitally signed** by the certification authority issuing it."*

- *"A **set of data** that uniquely identifies a key pair owner that is authorized to use the key pair, **contains** the owner's public key and possibly other information, and **is digitally signed** by a Certification Authority (i.e., a trusted party), thereby binding the public key to the owner."*

- *"A **data structure** that **contains** an entity's identifier(s), the entity's public key (including an indication of the associated set of domain parameters) and possibly other information, along with **a signature** on that data set that is generated by a trusted party, i.e., a certificate authority, thereby binding the public key to the included identifier(s)."*

- *"A **set of data** that uniquely identifies an entity, **contains** the entity's public key and possibly other information, and **is digitally signed** by a trusted party, thereby binding the public key to the entity identified in the certificate. Additional information in the certificate could specify how the key is used and the validity period of the certificate."*

- *"A **set of data** that uniquely identifies an entity, **contains** the entity's public key and possibly other information, and **is digitally signed** by a trusted party, thereby binding the public key to the entity. Additional information in the certificate could specify how the key is used and its validity period."*

- *"A **set of data** that uniquely identifies an entity, **contains** the entity's public key and possibly other information, and **is digitally signed** by a trusted party, thereby binding the public key to the entity. Additional information in the certificate could specify how the key is used and its validity period."*

- *"A **set of data** that uniquely identifies an entity, **contains** the entity's public key and possibly other information, and **is digitally signed** by a trusted party, thereby binding the public key to the entity. Additional information in the certificate could specify how the key is used and its validity period***"***

- ***"**A **set of data** that uniquely identifies an entity, **contains** the entity's public key and possibly other information, and **is digitally signed** by a trusted party, thereby binding the public key to the entity. Additional information in the certificate could specify how the key is used and its validity period."*

Declaration of D. Znidarsic in Support of Claim Construction                    Case No. 24-CV-00902-JD

- *"A **digital document** issued and **digitally signed** by the private key of a certificate authority that binds an identifier to a subscriber's public key. The certificate indicates that the subscriber identified in the certificate has sole control of and access to the **private key**."*

- *"Also known as a digital certificate. A **digital representation of information** which at least 1. identifies the certification authority issuing it, 2. names or identifies its subscriber, 3. **contains** the subscriber's public key, 4. identifies its operational period, and 5. **is digitally signed** by the certification authority issuing it."*

99.    Furthermore, the IETF RFC 5280 (https://datatracker.ietf.org/doc/html/rfc5280#page-9) defines a certificate to be "digitally signed" with a "private key" (highlighting added):[1]

> Users of a public key require confidence that the associated **private key** is owned by the correct remote subject (person or system) with which an encryption or digital signature mechanism will be used. This confidence is obtained through the use of public key certificates, which are data structures that bind public key values to subjects.  The binding is asserted by having a trusted CA **digitally sign** each certificate.  The CA may base this assertion upon technical means (a.k.a., proof of possession through a challenge-response protocol), presentation of the **private key**, or on an assertion by the subject.  A certificate has a limited valid lifetime, which is indicated in its signed contents.  Because a certificate's signature and timeliness can be independently checked by a certificate-using client, certificates can be distributed via untrusted communications and server systems, and can be cached in unsecured storage in certificate-using systems.

100.    Thus, in the context of the '041 patent, a POSITA would have understood "certificate" to mean "a digital document including data plus a digital signature generated by the management server based on the data and private key of the management server".

---

[1] A Requests for Comments (RFC) is a publicly available, authoritative technical publication produced by the Internet Engineering Task Force (IETF) that specifies an Internet protocol, standard, or a best practice. RFCs serve as the primary references for technologies such as TCP/IP, HTTP, TLS, DNS, and X.509 certificates. Certain RFCs, once approved through the IETF standards process, constitute official Internet standards. The IETF RFC 5380 is one of thousands of such technical publications.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|-----------|---------------|-------------------------------|--------------------------------|
| Samsara's '706 claims 1-6 | "a sequence number for each [sensor measurement]" | "a sequence number assigned to each sensor measurement" | Plain and ordinary meaning |

101.    Motive is proposing a claim construction for "a sequence number for each [sensor measurement]" based on the '706 specification. Since the claim element contains the weak conjunctive word "for", as in "a sequence number **for** each [sensor measurement]" (highlighting added), a construction which better defines the connection between "sequence numbers" and "sensor measurements" is necessary.

102.    The sentence in the specification which supplements "a sequence number for each [sensor measurement]" is at 13:30-33 (highlighting added) – "*The **sequence numbers** and the time stamps are **generated** by the WSD 115 **when the sensor measurements are recorded** in response to detection of physical events.*" This sentence shows that a sequence number does not exist prior to the detection of a physical event, but rather is generated by the WSD as a result of a physical event and assigned to the sensor measurement.

103.    Furthermore, another sentence in the specification which supplements "a sequence number for each [sensor measurement]" is at 12:53-58, which clarifies that sequence numbers are **associated** with sensor measurements (highlighting added) – "*At operation 315 the management server 140 reconciles the data received from each WSD through respective gateway devices based on the sequence numbers and the time stamps **associated** with each sensor measurement to generate reconciled sensor measurements in which duplicates have been removed.*"

104.    For the definition of "a sequence number for each [sensor measurement]", a POSITA would have understood it to mean "a sequence number assigned to each sensor measurement".

**Declaration of D. Znidarsic in Support of Claim Construction**                    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Samsara's '706 claims 1-6 | "[first/second/third/fourth] secure communication channel" | Each of the first, second, third, and fourth secure communication channel is a separate and unique channel | Plain and ordinary meaning |

105.    Motive is proposing a claim construction for "[first/second/third/fourth] secure communication channel" in order to clarify the language in the '706 claims, which is needed because of a contradiction between the "first secure communication channel" defined in claim 1 and referenced in claim 6.

106.    Claim 1 defines that "a first secure communication channel" is between "a first gateway device" and "the management server device" (highlighting added):

1[a][i]. *receiving, upon establishment of **a first secure communication channel** between **a first gateway device** of a plurality of gateway devices **and the management server device***, ...

107.    However, claim 6, which is dependent on claim 1, references the "the first secure communication channel" and defines it to be between "the wireless sensing device" and "the first gateway device" (highlighting added):

6. *The method of claim 1, wherein the second gateway device and the first gateway device are the same gateway device, and wherein the second secure communication channel is established following a disconnection of **the first secure communication channel** between the **wireless sensing device** and **the first gateway device**.*

108.    Because of this contradiction, there is a need for clarification of the first, second, third, and fourth secure communication channels.

109.    The following is an analysis which uses the language of claim 1 to pair-wise compare each secure communication channel; that is, compare 1st to 2nd, 1st to 3rd, 1st to 4th, 2nd to 3rd, 2nd to 4th,

-33-

and 3rd to 4th. Furthermore, for comparisons involving the 1st communication channel, I included comparisons where the 1st communication channel is defined as in claim 1 and where the 1st communication channel is defined as in claim 6, albeit a contradicting definition.

110.    Per claim 1, the first secure communication channel is between "a first gateway device" and "the management server device", while the second secure communication channel is between "the first gateway device" and "the first wireless sensing device", thus they are separate and unique, as follows (highlighting added):

1[a][i]. *receiving, upon establishment of **a first secure communication channel between a first gateway device** of a plurality of gateway devices **and the management server device**, ...*

1[a][ii]. *wherein the data was transmitted to the first gateway device from a first wireless sensing device of the plurality of wireless sensing devices over **a second secure communication channel between the first gateway device and the first wireless sensing device**,*

111.    Per claim 6, the first and second secure communication channels are not connected at the same time; that is, "the second secure communication channel is established following a disconnection of the first secure communication channel", thus they are separate and unique, as follows (highlighting added):

6. *The method of claim 1, wherein the second gateway device and the first gateway device are the same gateway device, and wherein **the second secure communication channel is established following a disconnection of the first secure communication channel** between the wireless sensing device and the first gateway device.*

112.    Per claim 1, the first secure communication channel is between "a first gateway device" and "the management server device", while the third secure communication channel is between "a second gateway device" and "the management server device", thus they are separate and unique, as follows (highlighting added):

1[a][i]. *receiving, upon establishment of **a first secure communication channel between a first gateway device** of a plurality of gateway devices **and the management server device**, ...*

-34-

1[b][i]. *receiving, upon establishment of **a third secure communication channel between a second gateway device** of the plurality of gateway devices **and the management server device**, data indicative of a second plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each,*

113.    Per claim 6, the first secure communication channel is between "the wireless sensing device" and "the first gateway device", while per claim 1, the third secure communication channel is between "a second gateway device" and "the management server device", thus they are separate and unique, as follows (highlighting added):

6. *The method of claim 1, wherein the second gateway device and the first gateway device are the same gateway device, and wherein the second secure communication channel is established following a disconnection of **the first secure communication channel between the wireless sensing device and the first gateway device**.*

1[b][i]. *receiving, upon establishment of **a third secure communication channel between a second gateway device** of the plurality of gateway devices **and the management server device**, data indicative of a second plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each,*

114.    Per claim 1, the first secure communication channel is between "a first gateway device" and "the management server device" while the fourth secure communication channel is between "the second gateway device" and "the wireless sensing device", thus they are separate and unique, as follows (highlighting added):

1[a][i]. *receiving, upon establishment of **a first secure communication channel between a first gateway device** of a plurality of gateway devices **and the management server device**, ...*

1[b][ii]. *wherein the data was transmitted to the second gateway device from the wireless sensing device through **a fourth secure communication channel between the second gateway device and the wireless sensing device** following disconnection of the second secure communication channel between the first gateway device and the wireless sensing device;*

115.    Per claim 6, the first secure communication channel is between "the wireless sensing device" and "the first gateway device", while per claim 1, the fourth secure communication channel is

between "the second gateway device" and "the wireless sensing device", thus they are separate and unique, as follows (highlighting added):

> 6. *The method of claim 1, wherein the second gateway device and the first gateway device are the same gateway device, and wherein the second secure communication channel is established following a disconnection of **the first secure communication channel between the wireless sensing device and the first gateway device***.

> 1[b][ii]. *wherein the data was transmitted to the second gateway device from the wireless sensing device through **a fourth secure communication channel between the second gateway device and the wireless sensing device** following disconnection of the second secure communication channel between the first gateway device and the wireless sensing device*;

116.    Per claim 1, the second secure communication channel is between "the first gateway device" and "the first wireless sensing device" while the third secure communication channel is between "the second gateway device" and "the management server device", thus they are separate and unique, as follows (highlighting added):

> 1[a][ii]. *wherein the data was transmitted to the first gateway device from a first wireless sensing device of the plurality of wireless sensing devices over **a second secure communication channel between the first gateway device and the first wireless sensing device**,*

> 1[b][i]. *receiving, upon establishment of **a third secure communication channel between a second gateway device** of the plurality of gateway devices **and the management server device**, data indicative of a second plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each*,

117.    Per claim 1, the second secure communication channel is between "the first gateway device" and "the first wireless sensing device" while the fourth secure communication channel is between "the second gateway device" and "the wireless sensing device", thus they are separate and unique, as follows (highlighting added):

> 1[a][ii]. *wherein the data was transmitted to the first gateway device from a first wireless sensing device of the plurality of wireless sensing devices over **a second secure communication channel between the first gateway device and the first wireless sensing device**,*

1[b][ii]. *wherein the data was transmitted to the second gateway device from the wireless sensing device through a **fourth secure communication channel between the second gateway device and the wireless sensing device** following disconnection of the second secure communication channel between the first gateway device and the wireless sensing device*;

118.    Per claim 1, the third secure communication channel is between "a second gateway device" and "the management server device" while the fourth secure communication channel is between "the second gateway device" and "the wireless sensing device", thus they are separate and unique, as follows (highlighting added):

1[b][i]. *receiving, upon establishment of **a third secure communication channel between a second gateway device** of the plurality of gateway devices **and the management server device**, data indicative of a second plurality of sensor measurements taken over time, a sequence number for each, and a time stamp for each,*

1[b][ii]. *wherein the data was transmitted to the second gateway device from the wireless sensing device through a **fourth secure communication channel between the second gateway device and the wireless sensing device** following disconnection of the second secure communication channel between the first gateway device and the wireless sensing device*;

119.    For the construction of "[first/second/third/fourth] secure communication channel", a POSITA would have construed the term to mean each of the first, second, third, and fourth secure communication channel being a separate and unique channel.

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Samsara's '706 claims 1-6 | "reconciling the data indicative of the first plurality of sensor measurements and the data indicative of the second plurality of sensor measurements based on the | This step occurs in the management server device and after the two previous recited "receiving" steps | Plain and ordinary meaning |

-37-

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| | sequence numbers and time stamps" | | |

120.    Motive is proposing a claim construction for "reconciling the data indicative of the first plurality of sensor measurements and the data indicative of the second plurality of sensor measurements based on the sequence numbers and time stamps" that clarifies where this step must occur in context.

121.    The following are the steps of the '706 patent from claim 1 (highlighting added):

1[pre]. *A method in a management server device for supporting secure offline data logging in sensor networks, wherein the sensor networks include a plurality of wireless sensing devices operative to detect physical events and to generate sensor measurements in response to the detection of the physical events, the method comprising:*

1[a][i]. *receiving, upon establishment of a first secure communication channel between a first gateway device of a plurality of gateway devices and the management server device,* **data indicative of a first plurality of sensor measurements** *taken over time, a sequence number for each, and a time stamp for each,*

1[a][ii]. *wherein the data was transmitted to the first gateway device from a first wireless sensing device of the plurality of wireless sensing devices over a second secure communication channel between the first gateway device and the first wireless sensing device,*

1[a][iii]. *and wherein the management server device tracks which of the plurality of gateway devices and which of the plurality of wireless sensing devices is associated with which of a plurality of organizations,*

1[b][i]. *receiving, upon establishment of a third secure communication channel between a second gateway device of the plurality of gateway devices and the management server device,* **data indicative of a second plurality of sensor measurements** *taken over time, a sequence number for each, and a time stamp for each,*

1[b][ii]. *wherein the data was transmitted to the second gateway device from the wireless sensing device through a fourth secure communication channel between the second gateway device and the wireless sensing device following disconnection of the second secure communication channel between the first gateway device and the wireless sensing device;*

1[c]. *reconciling* **the data indicative of the first plurality of sensor measurements** *and* **the data indicative of the second plurality of sensor measurements** *based on the sequence numbers and*

-38-

*the time stamps to generate reconciled sensor measurements in which duplicates have been removed; and*

1[d]. *providing for display a user interface including a representation of the reconciled sensor measurements over time.*

122.    The step for which claim construction is proposed is step 1[c]. Step 1[c] requires both "the data indicative of **the** first plurality of sensor measurements" (highlighting added) and "the data indicative of **the** first plurality of sensor measurements" (highlighting added) to be received before the "reconciling" can occur in step 1[c].

123.    Step 1[a][i] indicates that "data indicative of **a** first plurality of sensor measurements" (highlighting added) is received in that step, and step 1[b][i] indicates that "data indicative of **a** second plurality of sensor measurements" (highlighting added) is received in that step. Therefore, step 1[c] occurs after the two previous recited "receiving" steps (i.e., steps 1[a] and 1[b]), which is consistent with Motive's proposed claim construction that this step occurs after the two previous recited "receiving" steps.

124.    Furthermore, step 1[c] occurs in the management server device for the following reasons.

125.    The abstract describes "reconciling the data at the management server".

126.    In Fig. 1, the step labeled "[12]" in the box at the lower left describes "Reconcile the data" and this box is connected to the box labeled "MANAGEMENT SERVER (MS) 140".

Fig. 1

127.     In Fig. 3, the box labeled "315)" describes "Reconcile the data" and this box is connected to the box labeled "MANAGEMENT SERVER 140".



128.     In the "ladder" diagram of Fig. 4, the box labeled "(415)" describes "Reconcile the data" and this box is connected to the box labeled "Management Server (MS) 140".



Fig. 4

129.    In Fig. 10, the text in the lower right of the figure describes "Reconciliation of duplicate WSD data". This text and the box labeled "MANAGEMENT SERVER 140" both appear at the same level of the figure, as indicated by the green dashed line I added to the figure in order to emphasize their relationship.



130.    In Fig. 11, the box labeled "MEASUREMENT RECONCILIATION MODULE 1158" appears within the box labeled "MANAGEMENT DEVICE 1130".



Fig. 11

131.    The specification states the following:

- "the management server 140 reconciles the data" (9:17-18)
- "the management server 140 reconciles the data" (14:21)
- "The reconciliation of the data by the management server" (14:48-49)
- "the management server 140 reconciles the data" (15:33)
- "to enable the management server 140 to reconcile data of a WSD" (23:46-47)
- "The management server 140 reconciles the data received from each WSD" (25:38-40)

**Declaration of D. Znidarsic in Support of Claim Construction**    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

1    • "The sensor network manager 144 further includes a measurement reconciliation module 1158
2      used to reconcile data received for each WSD" (27:3-5)

3    132.    Furthermore, insofar as the preamble of claim 1 is limiting, all the steps of claim 1,
4  including its step 1[c], occur in the management server (highlighting added):

5
6      1[pre]. *A method in a management server device for supporting secure offline data logging in
7      sensor networks, wherein the sensor networks include a plurality of wireless sensing devices
8      operative to detect physical events and to generate sensor measurements in response to the
       detection of the physical events, the method comprising:*

9    133.    For the construction of "reconciling the data indicative of the first plurality of sensor
10 measurements and the data indicative of the second plurality of sensor measurements based on the
11 sequence numbers and time stamps", a POSITA would have understood that this occurs in the
12 management server device and after the two previous recited "receiving" steps.

13

| Patent(s) | Claim Element | Motive's Proposed Construction | Samsara's Proposed Construction |
|---|---|---|---|
| Samsara's '685 claim 1-8 | "a conducting path between a starter motor of the vehicle and a battery of the vehicle" | "a path over which electrical current is conducted from the battery to the motor that turns the engine when starting the vehicle" | Plain and ordinary meaning |

134.    Motive is proposing a claim construction for "a conducting path between a starter motor
of the vehicle and a battery of the vehicle" that puts the claim element in context.

135.    The following is claim 1 of the '685 patent (highlighting added):

1[pre]. *A method comprising:*

1[a]. *receiving, from a client device and by one or more processors, a command to cause a
change in a configuration associated with a vehicle; and*

1[b]. *in response to the command, causing the vehicle to modify the configuration of an
electronic switch from a first configuration to a second configuration, the electronic switch*

-45-

*positioned within the vehicle in **a conducting path between a starter motor of the vehicle and a battery of the vehicle**, wherein the first configuration of the electronic switch is a closed configuration creating an uninterrupted conducting path, and the second configuration of the electronic switch is an open configuration creating an interrupted conducting path.*

136.    The specification of the '685 patent describes that the term "starter" is being used as an abbreviation for the term "starter motor" (2:38), and that an "electrical current" is "passing through the conducting path 408 between the battery and the starter" (7:38-39).

137.    Regarding whether the "conducting path" has a direction and, if so, in what direction the "electrical current" is being conducted, the specification of the '685 patent describes that "the starter 406 draws power from the battery via the conducting path" (7:26-28) and that "the starter may pull power from the battery" (2:47-48).

138.    Regarding the purpose of the "motor", the specification of the '685 patent describes that "the starter may pull power from the battery to ignite the engine" (2:47-48). A POSITA at the time of the invention would understand that the starter motor "ignit[es] the engine" by "turning the engine".

139.    Regarding under what conditions the "conducting path" is used, the specification of the '685 patent describes that the term "starter" is being used as an abbreviation for the term "starter motor" (2:38), and that "the vehicle is mobilized (e.g., can be started using the starter)" (2:48-49). A POSITA would understand the patent to mean that "mobilizing" (i.e., starting) a vehicle using the "starter" (i.e., "starter motor") occurs when an electrical current is conducted over a conducting path from the battery to the "starter motor".

140.    Thus, for the construction of "a conducting path between a starter motor of the vehicle and a battery of the vehicle", a POSITA would have understood this to mean "a path over which electrical current is conducted from the battery to the motor that turns the engine when starting the vehicle".

1    I declare under penalty of perjury under the laws of the United States of America that the

2 statements contained in my declaration herein are true and correct to the best of my knowledge.

3 Executed in San Francisco, California on January 15, 2026:

By:    David Znidarsic

**Declaration of D. Znidarsic in Support of Claim Construction**                    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

1    **EXHIBIT A – C.V. OF DAVID ZNIDARSIC**

2

3    # David Znidarsic

4

5    380 Pacheco Street, San Francisco, CA 94116 | 650-576-3870 | djznidarsic@stairstepconsulting.com

6    **Summary**
     30+ years of experience in the Silicon Valley computer industry, holding positions as: Company
7    Founder, Intellectual Property Expert, Software Security Expert, Testifying Expert, Forensic Software
     Expert, Open Source Software Expert, Information Security Officer, Vice President of Technology, Vice
8    President of Engineering, Software Development Director, Software Development Manager, iOS App
     Developer, Applications Software Development Engineer, and Systems Software Development
9    Engineer.

10   **Intellectual Property Litigation, M&A, and Licensing Experience**
11   • **Stairstep Consulting LLC – President / CEO (2017 - present)**

12       • **Motive v. Samsara** – Testifying Expert, contracted by Greenberg Traurig, Greenberg
          Traurig counsel for the plaintiff, for patent litigation regarding vehicular Electronic Logging
13        Devices (ELDs), United States District Court, Northern District of California: *Motive
          Technologies, Inc., Plaintiff, v. Samsara Inc., Defendant*; 24-cv-00902; (September 2025 to
14        present)

15       • **DraftKings v. Diogenes –** Forensic Software Expert, contracted by eComp Consultants and
          Intuity Consultants, Gilbert's LLP counsel for the patent owner, for Inter Partes Review of
16        patent regarding multi-leg wagering, United States Patent Trial and Appeal Board: *DK
          Crown Holdings Inc., Petitioner v. Diogenes Limited, Patent Owner*; IPR2023-00268 Patent
17        11,200,779 B2 (August 2025 to September 2025)

18

19       • **Nutanix v. former employees –** Forensic Software Expert, contracted by Intuity
          Consultants, Quinn Emanuel counsel for the respondent, for copyright and trade secret
20        litigation regarding enterprise management software, JAMS Arbitration: *Nutanix, Inc.,
          Claimant vs. Bala Kuchibhotla, Kamaldeep Khanuja, Bakul Banthia, Respondent*; JAMS
21        Ref. No. 5110000487 (August 2025 to September 2025)

22       • **G and G Funding v. Miyeya Auto Import -** Testifying Expert, contracted by eComp
23        Consultants and Intuity Consultants, Kurtz Law counsel for the plaintiff, for contract
          litigation regarding geolocation services, in Circuit Court of Cook County, Illinois, Law
24        Division, Tax and Miscellaneous Remedies Section: *G and G Funding Group LLC v. Miyeya
          Auto Import and Felix M Difo*; No. 2025L050318, Calendar 1; (July 2025)

25

26       • **Mullen v. Samsung -** Forensic Software Expert, contracted by eComp Consultants, Mintz,
          Levin, Cohn, Ferris, Glovsky, and Popeo counsel for the plaintiff, for patent litigation
27        regarding smart watch and cellular telephone technologies, in United States District Court,
          for the Eastern District of Texas, Marshall Division: *Mullen Industries LLC., Plaintiff v.*

28

**Declaration of D. Znidarsic in Support of Claim Construction**                    **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

*Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc., Defendants*; 2:24-cv-00049; (June 2025)

- **UCT v. Lenovo -** Forensic Software Expert, contracted by Intuity Consultants, Kilpatrick Townsend & Stockton LLP counsel for the defendant, for patent litigation regarding USB, DisplayPort, and PCIe communication technologies, in United States District Court, for the Eastern District of Texas, Marshall Division: *Universal Connectivity Technologies, Inc., Plaintiff v. Lenovo Group Limited, Defendants*; 2:23-cv-00449; (March 2025 to present)

- **Maxell v. TCL -** Testifying Expert, contracted by King & Spalding, King & Spalding counsel for the defendant, for ITC actions regarding internet-connected televisions: *Maxell, Ltd., Plaintiff v. TCL Electronic Holdings Co., Ltd., Defendants, et al.*; 337-TA-1420; (December 2024 to June 2025)

- **Maxell v. TCL -** Testifying Expert, contracted by Merchant & Gould, Merchant & Gould counsel for the defendant, for patent litigation regarding internet-connected televisions, in United States District Court, for the Eastern District of Texas, Texarkana Division: *Maxell, Ltd., Plaintiff v. TCL Electronic Holdings Co., Ltd., Defendants, et al.*; 5:23-cv-00108; (January 2025 to March 2025)

- **Maxell v. TCL -** Testifying Expert, contracted by King & Spalding, King & Spalding counsel for the defendant, for patent litigation regarding internet-connected televisions in United States District Court, for the Eastern District of Texas, Texarkana Division: *Maxell, Ltd., Plaintiff v. TCL Electronic Holdings Co., Ltd., Defendants, et al.*; 5:23-cv-00108; (December 2024 to January 2025)

- **Entropic v. Comcast** – Forensic Software Expert, contracted by Intuity Consultants, Winston & Strawn LLP counsel for Comcast, for patent litigation regarding home networking communication software, in the United States District Court, Central District of California: *Entropic Communications, LLC, Plaintiff v. Comcast Corporation et alia, Defendants*; Case No. 2:23-cv-1048 (October 2024 to December 2024)

- **Abbott v. Dexcom - Dexcom v. Abbott –** Forensic Software Expert, contracted by Intuity Consultants, Keker, Van Nest & Peters LLP counsel for Dexcom, for patent litigation regarding medical device software, in United States District Court for the District of Delaware: *Abbott Diabetes Care; et al., Plaintiffs, v. Dexcom, Defendant; Dexcom, Counterclaim-Plaintiff, v. Abbott Diabetes Care; et al., Counterclaim-Defendants*; C.A. No. 23-239; (September 2024)

- **Dexcom v. Abbott - Abbott v. Dexcom -** Forensic Software Expert, contracted by Intuity Consultants, Keker, Van Nest & Peters LLP counsel for Dexcom, for patent litigation regarding medical device software, in United States District Court for the District of Delaware: *Dexcom, Plaintiff, v. Abbott Diabetes Care; et al., Defendants; Abbott Diabetes Care; et al., Plaintiffs, v. Dexcom, Defendant*; C.A. No. 22-605, C.A. No. 21-1669 (Consolidated); (September 2024)

- **B.E. Technology v. Twitter** – Forensic Software Expert, contracted by eComp Consultants, King & Wood Mallesons/Skiermont Derby, LLP counsel for B.E. Technology, for patent litigation regarding social networking advertisements, in the United States District Court for the District of Delaware: *B.E. Technology, L.L.C., Plaintiff, v. Twitter, Inc., Defendant;* C.A. No. 1:20-cv-00621 (July 2024 to February 2025)

- **Veeva v. Aktana -** Forensic Software Expert, contracted by Intuity Consultants, Finnegan Henderson Farabow Garrett & Dunner LLP counsel for the plaintiff, for patent litigation regarding pharmaceuticals management cloud services, in United States District Court, District of Delaware: *Veeva Systems, Inc. v. Tact.AI and Aktana, Inc.;* 1:23-cv-01032; (May 2024 to June 2024)

- **Griffith v. TikTok** – Forensic Software Expert, contracted by Intuity Consultants, Susman Godfrey counsel for the plaintiff, for class action regarding data privacy, in United States District Court, Central District of California: *Griffith, et al. v. TikTok, et al.;* 5:23-cv-00964; (August 2024)

- **Omnitracs v. Motive -** Testifying Expert, contracted by King & Spalding, King & Spalding counsel for the defendant, for patent litigation regarding vehicular Electronic Logging Devices (ELDs), in United States District Court, Northern District of California: *Omnitracs, et al. v. Motive;* 3:23-cv-05261; (April 2024 to April 2025)

  - Testified as expert witness at trial on 2025-04-21

  - Deposed as expert witness on 2024-11-22

  - Filed expert report on 2024-11-05
    - Title: *David Znidarsic Rebuttal Source Code Analysis*

  - Filed expert report on 2024-08-25
    - Title: *David Znidarsic Analysis of Omnitracs Source Code*

- **Nokia v. Amazon** – Forensic Software Expert, contracted by Intuity Consultants, Perkins Coie LLP counsel for the defendant, for ITC actions regarding streaming digital video: *Nokia v. Amazon et al.;* 337-TA-1379; (July 2024)

- **Nokia v. Amazon** – Forensic Software Expert, contracted by Intuity Consultants, Perkins Coie LLP counsel for the defendant, for ITC actions regarding streaming digital video: *Nokia v. Amazon et al.;* 337-TA-1380; (April 2024 to June 2024)

- **SitNet v. Meta** – Forensic Software Expert, contracted by Intuity Consultants, Davis Polk LLP counsel for the defendant, for patent litigation regarding social media services, in United States District Court, Southern District of New York: *SitNet LLC v. Meta Platforms, Inc.;* 1:23-cv-06389; (February 2024)

- **Pantech v. LG** – Forensic Software Expert, contracted by Intuity Consultants, Mayer Brown counsel for the plaintiff, for patent litigation regarding cellular communications technology,

in the United States District Court for the Eastern District of Texas, Texarkana Division: *Pantech Corporation and Pantech Wireless, LLC v. LG Electronics Inc., and LG Electronics U.S.A., Inc.*; 5:22-cv-00113 (December 2023 to June 2024)

- **WhatsApp v. NSO -** Forensic Software Expert, contracted by Intuity Consultants, Davis Polk LLP counsel for the plaintiff, for contract litigation regarding social media services, in the United States District Court for the Northern District of California: *WhatsApp LLC et al. v. NSO Group Techs. Ltd, et al.*; 4:19-cv-07123 (September 2023 to September 2024)

- **BSD Crown v. Amazon/Twitch -** Forensic Software Expert, contracted by Intuity Consultants, Perkins Coie LLP counsel for the defendant, for patent litigation regarding streaming digital video, in the United States District Court for the Northern District of California: *BSD Crown, LTD v. Amazon, Inc., Amazon Web Services, Inc., and Twitch Interactive, Inc.*; 3:23-cv-00057 (August 2023 to September 2023)

- **Touchstream v. Comcast –** Forensic Software Expert, contracted by Intuity Consultants, Davis Polk LLP counsel for the defendant, for patent litigation regarding streaming digital video, in the United States District Court for the Eastern District of Texas Marshall Division: *Touchstream Technologies, Inc., Plaintiff v. Comcast Cable Communications, et al., Defendants*; 23-cv-00062 (July 2023 to July 2024)

- **CloudOfChange v. Lightspeed –** Forensic Software Expert, contracted by Intuity Consultants, Patterson & Sheridan LLP counsel for the plaintiff, for patent litigation regarding point-of-sale terminal software, in the United States District Court for the Western District of Texas Waco Division: *CloudOfChange, Inc., Plaintiff v. Lightspeed POS, Inc., Defendant*; 6:21-cv-01102-ADA (April 2023 to October 2023)

- **Abbott v. Dexcom –** Forensic Software Expert, contracted by Intuity Consultants, Keker, Van Nest & Peters LLP counsel for the defendant, for patent litigation regarding medical device software, in the United States District Court for the District of Delaware: *Abbott Diabetes Care Inc. and Abbott Diabetes Care Limited, Plaintiffs v. Dexcom, Inc., Defendant*; C.A. No. 21-977 (KAJ) (November 2022 to April 2023)

- **VideoShare v. Meta –** Forensic Software Expert, contracted by Intuity Consultants, Kilpatrick Townsend, counsel for the defendant, for patent litigation regarding digital video distribution, in the United States District Court for the Western District of Texas: *VideoShare, LLC v. Meta Platforms, Inc.*; 6:21-cv-00254 (November 2022)

- **Broadband iTV v. Comcast -** Forensic Software Expert, contracted by Intuity Consultants, Davis Polk counsel for a proposed respondent, for patent litigation regarding consumer video entertainment devices, in the United States International Trade Commission: *Broadband iTV, Inc. (Complainant) v. Comcast Corporation, Charter Communications, Inc., and Altice USA, Inc. (Proposed Respondents);* (August 2022 to October 2022)

- **Google v. Sonos -** Forensic Software Expert, contracted by Precedia Associates, Quinn Emanuel Urquhart & Sullivan counsel for the plaintiff, for patent litigation regarding consumer audio entertainment devices, in the United States District Court, Northern District

of California: *Google LLC (Plaintiff) v. Sonos, Inc. (Defendant)*; Case No. 3:20-cv-06754-WHA (February 2022 to July 2022)

- **eBuddy v. LinkedIn -** Forensic Software Expert, contracted by Edmonds & Schlather, Edmonds & Schlather counsel for the plaintiff, for patent litigation regarding social media services, in the United States District Court for the District of Delaware: *eBuddy Technologies B.V., Plaintiff v. LinkedIn Corporation, Defendant*; C.A. No. 20-cv-1501-MN (December 2021 to October 2025)

  - Filed declaration on 2025-05-08
    - Title: *Declaration of David Znidarsic in support of eBuddy's letter brief*

  - Filed declaration on 2025-04-24
    - Title: *Declaration of David Znidarsic in support of eBuddy's letter brief*

  - Filed declaration on 2025-04-21
    - Title: *Declaration of David Znidarsic submitted in support of eBuddy's responsive letter brief*

- **Facebook v. BrandTotal -** Forensic Software Expert, contracted by Precedia Associates, WilmerHale counsel for the plaintiff, for a breach of contract and violation of Computer Fraud and Abuse Act (CFAA) litigation regarding social media services, in the United States District Court, Northern District of California: *Facebook, Inc., Plaintiff v. BrandTotal LTD., and Unimania, Inc., Defendants*; Civil Action No. 3:20-CV-07182-JCS (December 2021 to January 2022)

- **StreamScale v. Intel -** Forensic Software Expert, contracted by Intuity Consultants, WilmerHale counsel for a defendant, for patent litigation regarding data management technologies, in the United States District Court for the Western District of Texas: *StreamScale, Inc., Plaintiff v. Cloudera, Inc., Automatic Data Processing Inc., Experian PLC, Wargaming (AUSTIN), Inc., and Intel Corporation, Defendants*; Case No. 6:21-cv-00198-ADA (August 2021 to December 2021)

- **Chamberlain v. Overhead Door -** Forensic Software Expert, contracted by Winston & Strawn LLP, Winston & Strawn LLP counsel for the plaintiff, for patent litigation regarding consumer and industrial devices, in the United States District Court for the Eastern District of Texas, Marshall Division: *The Chamberlain Group, Inc., Plaintiff v. Overhead Door Corporation, et al, Defendants*; Case No. 2:21-CV-0084-JRG (July 2021 to June 2022)

- **Zoho v. Freshworks -** Forensic Software Expert, contracted by Intuity Consultants, Keker, Van Nest & Peters LLP counsel for the defendant, for trade secret litigation regarding Customer Relationship Management (CRM) services, in the United States District Court for the Northern District of California: *Zoho Corporation Pvt. Ltd v. Freshworks, Inc.*, Case No. 3:20-cv-01869-VC (July 2021 to November 2021)

- **Oracle v. Rimini Street -** Forensic Software Expert, contracted by JurisLogic, Morgan, Lewis & Bockius counsel for the Plaintiffs, for copyright litigation regarding database management software, in the United States District Court, District of Nevada: *Oracle USA, Inc., Oracle America, Inc., and Oracle International Corporation, Plaintiffs, v. Rimini Street, Inc., Seth Ravin, Defendants*; Case No. 2:10-cv-00106-LRH-PAL (May 2021 to June 2021)

- **Sonos v. Google -** Forensic Software Expert, contracted by Precedia Associates, Quinn Emanuel Urquhart & Sullivan counsel for the defendant, for patent litigation regarding consumer audio devices, in the United States District Court for the Western District of Texas, Waco Division: *Sonos, Inc. (Plaintiff), v. Google LLC, (Defendant)*; Case 6:20-cv-00881-ADA (May 2021 to March 2022)

- **Commvault v. Rubrik -** Forensic Software Expert, contracted by Precedia Associates, Quinn Emanuel Urquhart & Sullivan, LLP counsel for the plaintiff, for patent litigation regarding database management software, in the United States District Court for the District of Delaware: *Commvault Systems, Inc. (Plaintiff and Counterclaim-Defendant), v. Rubrik Inc., (Defendant and Counterclaim-Plaintiff)*; Case No. 20-524-MN (April 2021 to August 2021)

- **MedImpact v. IQVIA -** Forensic Software Expert, contracted by JurisLogic, Pillsbury Winthrop Shaw Pittman counsel for the defendant, for trade secret litigation regarding health care management systems, in US District Court, Southern District of California: *MedImpact Healthcare Systems, Inc., et al. v. IQVIA Inc., et al.*; Case No. 19-cv-01865-GPC-DEB (February 2021 to November 2021)

- **Flexera -** Forensic Software Expert, contracted by Knobbe Martens, pre-litigation effort to evaluate copyright infringement contentions regarding commercial software packaging technologies (November 2020)

- **Facebook v. BlackBerry -** Forensic Software Expert, contracted by JurisLogic, Cooley counsel for the plaintiff, for trade secret litigation regarding vehicular Electronic Logging Devices (ELDs), in United States District Court for the Northern District of California: *Facebook, Inc. v. BlackBerry Limited and BlackBerry Corporation*; Case No. 4:18-cv-05434-JSW (August 2020 to December 2020)

- **JurisLogic -** Open Source Software Expert for a client in the desktop software space, contracted by JurisLogic (June 2020)

- **Qualcomm v. Apple -** Forensic Software Expert, contracted by JurisLogic, Fish & Richardson and Durie Tangri counsels for the defendant, for trade secret litigation regarding a consumer device manufacturer and one of its electronic parts suppliers, in San Diego Superior Court: *Qualcomm Incorporated v. Apple Inc.*; Case No. San Diego Superior Court Case No. 37-2017-00041389-CU-BC-NC (December 2018 to April 2019)

- **Apple v. Qualcomm -** Forensic Software Expert, contracted by JurisLogic, Bois Schiller Flexner counsel for the plaintiff, for patent litigation regarding a consumer device

manufacturer and one of its electronic parts suppliers, in the United States District Court for the Southern District of California: *Apple Inc. v. Qualcomm Incorporated*; Case No. 3:17-CV-1375-DMS-MDD (November 2018 to December 2018)

- **Motorola v. Hytera -** Forensic Software Expert, contracted by JurisLogic, Steptoe & Johnson counsel for the defendant, for trade secret and copyright litigation regarding commercial two-way radio technologies, in the United States District Court for the Northern District of Illinois, Eastern Division: *Motorola Solutions, Inc. et al. v. Hytera Communications Corporation Ltd., et al.*; Civil Action No.: 1:17-cv-01973 (October 2018 to March 2020)

- **TechDNA -** Open Source Software Expert and Software Security Expert for a client in the healthcare software space, contracted by TechDNA (August 2018)

- **Flexera -** Patent Portfolio Evaluator for a client in the digital rights management space, contracted by Knobbe Martens: *Flexera Software LLC* (August 2018)

- **TechDNA -** Open Source Software Expert and Software Security Expert for a client in the desktop software space, contracted by TechDNA (June 2018)

- **Boston Authentication Solutions v. Flexera -** Testifying Expert, contracted by Knobbe Martens, Knobbe Martens counsel for the defendant, for patent litigation regarding digital rights management technologies; case settled before expert report was due: *Boston Authentication Solutions, LLC v. Flexera Software LLC* (April 2018 to May 2018)

- **TechDNA -** Open Source Software Expert and Software Security Expert for a client in the desktop software space, contracted by TechDNA (March 2018 to July 2018)

- **Oracle v. Rimini Street -** Forensic Software Expert, contracted by JurisLogic, Morgan, Lewis & Bockius counsel for the counterclaimant, for copyright litigation regarding database management software, in the US District Court for the District of Nevada: *Rimini Street, Inc. (Plaintiff) v. Oracle International Corporation, et al. (Defendant); Oracle America, Inc., et al. (Counterclaimants) v. Rimini Street, Inc., et al. (Counterdefendants)*; Civil Case No. 2:14-cv-01699 LRH-CWH (September 2017 to November 2022)

  - Was disclosed in the *May 4, 2018 Expert Report of Barbara Ann Frederiksen-Cross* as a colleague who aided in the analysis and wrote exhibit drafts for the export report.

- **Black Duck -** Open Source Software Expert for an open source security and license compliance provider, contracted by Black Duck (August 2017 to October 2017)

- **JLI -** Open Source Software Expert for clients in the internet software space, contracted by JLI (July 2017)

- **TechDNA -** Open Source Software Expert, contracted by TechDNA (July 2017)

**Silicon Valley Experience**

- **Flexera / Macrovision – San Jose, CA – Information Security Officer, Technology Officer, Vice President of Engineering (2001 - 2017)**
  *an intellectual property protection company*

  - Technical forensic lead on many multi-year litigation proceedings involving Flexera's and Macrovision's patents, copyrights, trademarks, and software technologies, all resulting in favorable outcomes. Work included deep prior art research, giving three depositions, and managing subpoena responses.

  - Engaged as fact witness by Knobbe Martens, counsel for Flexera, deposed for patent litigation regarding digital rights management technologies

  - Engaged as fact witness by Knobbe Martens, counsel for Macrovision, deposed for copyright litigation regarding digital rights management technologies

  - Subject matter expert for Flexera's Legal team on all license agreement issues involving Flexera's technology.

  - Subject matter expert for Flexera's Engineering team on electronic license management security issues.

  - Created, and for 10 years managed, the Intellectual Property Office at Flexera, responsible for the prosecution and defense of the entire patent, copyright, trademark, and domain name portfolios.

  - Created, and for 9 years managed, the Open Source Usage Governance Program at Flexera, culminating in Flexera's acquisition of Palamida.

  - Led the technical and intellectual property due diligence of all Flexera target acquisitions, partners, and suppliers.

  - Managed the multi-year audit of Flexera's use of IBM's Cognos software, resulting in KPMG concluding that use to be fully compliant.

- **Virage – San Mateo, CA - Software Development Director (2000 - 2001)**
  *a digital video management company*

- **Informix – Menlo Park, CA - Software Development Director, Software Development Manager, Program Manager (1992 - 2000)**
  *a database management company*

- **Ingres – Alameda, CA - Software Development Manager (1990 - 1992)**
  *a database management company*

- **Quintus – Palo Alto, CA - Software Development Manager, Software Developer (1985 - 1990)**

*an artificial intelligence programming language company*

**Education**

- **Master of Science in Computer Science, Stony Brook University (1985)**
  - Awarded full scholarship and salaried teaching assistant post

  - Course lecturer for assembly language software development classes

  - Thesis project: design and implementation of a compiler and runtime environment for the interpreted artificial intelligence computer programming language Prolog; including lexical analysis, syntactic analysis, and assembly code generation

- **Bachelor of Science in Mathematics, Ohio State University (1983)**
  - Discrete Math concentration

  - Minor in Computer Science

**Technical Skills**
- Written software in scikit-learn, Swift (iOS), C (UNIX, Windows, macOS), Golang/Go, Java, Python 3.x and 2.x, JavaScript, Node.js, TypeScript, SQL, PSQL, PL/SQL, Jet SQL, BASIC/VBA, Motorola 68000 assembly language, Sun SPARC assembly language, Bourne shell script (aka bash), OpenSCAD, FreeCAD, GCODE, CGI, PHP, XQuery, XSL/XSLT, XPath, awk, perl, make, Postscript, Prolog, Emacs Lisp, Pascal, Modula2, COBOL, PL/1, Fortran, JCL, NXT-G, Hypertalk, Ruby, HTML, XML, JSON

- Analyzed software written in PyTorch, TensoFlow/Keras, ONNX, C++, Objective-C, Verilog/RTL, Verilog-Perl, C#, Ember, React, Lua, Scala, Kotlin, Groovy, YAML, Kafka, Thrift, Proto, IA64 assembly language, and proprietary DSP assembly language

- Analyzed implementations of standards: DisplayPort, USB-C, PCIe, MoCA, H.264/AVC, H.265/HEVC, OM/AV1, 3GPP, 5G, 4G/LTE, 3G/WCDMA, XMPP, HTTP, HTTP/S, TCP, UDP, IP, MQTT, SSL, TLS, SPI, I2C, UART, Bluetooth Low Energy (BLE), OBD-II

- Litigations related to the following technologies: Artificial Intelligence, Neural Network Training and Inference/Prediction, Supervised Machine Learning, Electronic Logging Devices (ELDs), Database Management, Cellular Networks, Mobile Devices, Web Applications, Web Servers, Web Application Servers, Digital Rights Management, Medical Devices, Health Care Applications, Home Entertainment Devices, Home Entertainment Networks, Industrial Devices, Digital Video Formats, Digital Video Streaming, Customer Relationship Management (CRM), Point of Sale Devices, Social Media Services, Social Media Ad Platforms, Data Privacy, Smart Televisions, Smart Wearables, Online Wagering, Geolocation, Communication Infrastructure.

- Developed iOS app published on the Apple App Store

**Patents**
- 8,997,176 – Device Identification Based on Event Logs

- 8,918,371 – Event Log Compensation

- 7,849,017 – Enforced Seat-Based Licensing

- 11/069,736 – Authenticated and confidential communication between software components executing in un-trusted environments


**Certifications**
- Information Security Manager® (CISM), issued by ISACA, license number 1736381


**Non-technical Skills**
- Excellent verbal and written communication skills

- Frequent public speaker on technical topics

- Years of technical writing experience

- Team management, project management, and collaboration skills


**Publications**
- *"Software Defined Networking: Monetising and Entitlement,"* Network Computing July 2013 Network Computing. *See*: http://www.btc.co.uk/Articles/index.php?mag=Networking&page=compDetails&link=2644&cat=Network

- *"Flexera Software Joins Distributed Management Task Force (DMTF) to Help Develop Cloud Licensing Standards,"* Aug 2011 Macrovision (quoted in press release). *See*: https://www.flexerasoftware.com/enterprise/company/news-center/press-releases/Flexera-Joins-DMTF-Cloud-Licensing-Standards-Task-Force.html

- *"Visible Ops: Private Cloud,"* Apr 2011 IT Process Institute (quoted in book). *See*: https://www.amazon.com/s/ref=nb_sb_noss?url=search-alias%3Dstripbooks&field-keywords=visible+ops+private+cloud

- *"Why Software Publishers are Migrating From Certificates to Activations,"* Oct 2010 Softsummit. *See*: https://www.slideshare.net/flexerasoftware/why-software-publishers-are-migrating-from-certificates-to-activations

- *"Entitlement and Usage Management Headaches Part II: Too many product models,"* Aug 2010 Cambridge Network. *See*: http://blogs.flexerasoftware.com/ecm/2010/08/entitlement-and-usage-

management-headaches-part-ii-too-many-product-models-configurationsstrategies-for-reducing-skus.html

- *"Entitlement and usage management headaches - Part I: Too many product models,"* Aug 2010 Cambridge Network. *See*: https://www.cambridgenetwork.co.uk/news/entitlement-and-usage-management-headaches-part-i-too-many/

- *"Managing Compliance and Software Lifecycles for Medical Device Manufacturers,"* Apr 2010 Medical Design Technology Magazine. *See*: https://www.mdtmag.com/article/2010/04/managing-compliance-and-software-lifecycles-medical-device-manufacturers

- *"Thinking About Virtualization,"* Nov 2009 Softsummit (coauthor). *See*: http://www.softsummit.com/library/presentations/2009/Thinking%20About%20Virtualization_David%20Znidarsic.pdf

- *"Entitlement-based, Field-upgradeable Hardware,"* Jun 2007 Flexera Software. *Document no longer available on-line, but available upon request*

- *"Licensing in Virtual Environments,"* Oct 2006 Flexera Software. *See*: http://www.softsummit.com/library/presentations/2006/DavidZnidarsic_Macrovision.pdf

- *"Setting a Course for SaaS,"* Oct 2006 Flexera Software. *Document no longer available on-line, but full text is available here*: https://www.dropbox.com/s/zcpu8k880lejdga/Setting%20a%20Course%20for%20SaaS.docx?dl=0

- *"Beyond the Bells and Whistles; New Software Distribution Models,"* Jun 2006 Flexera Software. *Document no longer available on-line, but available upon request*

- *"Getting it Wrong on Multicore,"* Apr 2005 CNET. *See*: https://www.cnet.com/news/getting-it-wrong-on-multicore/

- *"Macrovision Calls for Value-Based Licensing in Wake of Multi-Core Processing Debate,"* Apr 2005 Macrovision (quoted in article). *See*: https://www.flexerasoftware.com/producer/company/news-center/press-releases/Value-Based-Licensing-Multi-Core-Processing-Debate.html


- Expert Source Code Analysis
  - Source Code Printouts
  - Cite Lines
  - The Ties that Bind
  - Unboxing the Unboxed
  - Thumbs Down to the Desktop Services Store
  - The Workers' Place in History
  - Get the Git
  - Source of Source Code

1

- o Scope of Source Code
- o Source Code Comments not in Source Code
- o Source Code GPS
- o Truthy and Falsey Values

- Information Security and Data Privacy
  - o Practical guide to data privacy
  - o Practical proprietary and confidential information handling
  - o Reading the water for phish
  - o Gone phishin'
  - o Don't rely on password validity rules and mangling
  - o Personalized passphrase
  - o Beware of public Wi-Fi
  - o PII and Business Confidential Information (BCI)
  - o Tarred with the same brush
  - o Data Privacy Requires Data Security, Just Ask Equifax

- Product Composition Risk Management
  - o Product Composition Risk Management
  - o Crowdsourcing without the crowd
  - o Shadow Engineering
  - o Web APIs are the New Open Source Software
  - o We are all now in a Regulated Industry
  - o Open source governance hot potato
  - o Simple question, not so simple answer
  - o Assume Every Application is an On-Premises Application
  - o Assume Every Application is a Cloud Application
  - o Compliant? Sure, But with What?
  - o Best Technology Stack Transcends Language
  - o Can brand categorization inspire SCA innovation?

**Declaration of D. Znidarsic in Support of Claim Construction**     **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12

# EXHIBIT B – MATERIALS CONSIDERED

| Material Considered |
|---|
| EX1001 – U.S. Patent No. 11,875,580 (the '580 patent) (MOTIVE_NDCA_001729-0017301) |
| EX1002 – File History of U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0017302-0017482) |
| U.S. Patent No. 12,136,276 (the '276 patent) (MOTIVE_NDCA_0017483-0017505) |
| U.S. Patent No. 11,975,685 (the '685 patent) (MOTIVE_NDCA_0017506-0017530) |
| U.S. Patent No. 10,033,706 (the '706 patent) (MOTIVE_NDCA_0017531-0017572) |
| U.S. Patent No. 12,069,041 (the '041 patent) (MOTIVE_NDCA_00175373-0017616) |
| EX1005 – U.S. Patent Application Publication No. 2020/0410704 ("Choe")(MOTIVE_NDCA_0017617-0017635) |
| EX1057 – U.S. Patent Application Publication. No. 2019/0034740 ("Kwant1") (MOTIVE_NDCA_0017636-0017678) |
| EX1058 – U.S. Patent Application Publication. No. 2019/0102674 ("Kwant2")(MOTIVE_NDCA_0017679-0017704) |
| EX1007 – *Lane detection using lane boundary marker network with road geometry constraints*; Hussam Ullah Khan, et al. ("Khan") (MOTIVE_NDCA_0017705-0017714) |
| EX1008 – *Real-time vehicle distance estimation using single view geometry*, Ahmed Ali, et al. ("Ali") (MOTIVE_NDCA_0017715-0017724) |
| EX1011 – *Horizon Lines in the Wild*; Scott Workman, et Al. ("Workman") (MOTIVE_NDCA_0017725-0017736) |
| https://csrc.nist.gov/glossary/term/certificate (MOTIVE_NDCA_0017737) |
| https://datatracker.ietf.org/doc/html/rfc5280#page-9 (MOTIVE_NDCA_0017738-0017802) |
| https://www.qlik.com/us/predictive-analytics/predictive-modeling (MOTIVE_NDCA_0017803-0017809) |
| https://www.arimetrics.com/en/digital-glossary/predictive-model (MOTIVE_NDCA_0017810) |
| https://arxiv.org/abs/2012.04570 (MOTIVE_NDCA_0017811) |
| https://projecteuclid.org/euclid.ss/1009213726 (MOTIVE_NDCA_0017812) |
| https://www.britannica.com/dictionary/vehicle (MOTIVE_NDCA_0017813) |
| https://web.archive.org/web/20220530132036/https://www.lexico.com/definition/vehicle (MOTIVE_NDCA_0017814) |
| *Patent Owner's Response*; Case IPR2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0017815-0017882) |
| *Declaration of Scott Andrews*; Case IPR2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_017883-0017923) |
| *Memorandum of Points and Authorities in Support of Motive's Motion to Dismiss Patent Infringement Counterclaims [ecf 94-1] under rule 12(b)(6)*; Case No. 3:24-cv-00902-JD (MOTIVE_NDCA_0017924-0017947) |
| *Plaintiff Motive's Opposition to Defendant Samsara's Partial Motion to Dismiss Motive's Second Amended Complaint*; Case No. 3:24-cv-00902-JD (MOTIVE_NDCA_0017948-0017968) |
| *Decision*; Case IPR2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0017969-0017986) |
| *Patent Owner's Sur-Reply to Petitioner's Pre-Institution Reply to Patent Owner's Preliminary Response*; Case Ipr2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0017987-0017997) |
| *Patent Owner's Preliminary Response*; Case IPR2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0017998-0018040) |
| *Petitioner's Reply to Patent Owner's Preliminary Response*; Case IPR2025-00574; U.S. Patent No. 11,875,580 (MOTIVE_NDCA_0018041-0018049) |
| *Plaintiff Motive Technologies, Inc.'s Proposed Terms for Construction Under PLR 4-1*; Case No. 3:24-cv-00902-JD (MOTIVE_NDCA_0018050-0018053) |

| Material Considered |
| --- |
| *Petition for Inter Partes Review of U.S. Patent No. 12,136,276*; Case IPR2026-00034 (MOTIVE_NDCA_0018054-0018150) |
| *Samsara Inc.'s Patent L.R. 3-1 & 3-2 Disclosures*; Case No. 3:24-CV-00902-JD (MOTIVE_NDCA_0018151-0018167) |

**Declaration of D. Znidarsic in Support of Claim Construction**                     **Case No. 24-CV-00902-JD**
ACTIVE 717956460v12