GIBSON, DUNN & CRUTCHER LLP
JOSH KREVITT (SBN 208552)
JKrevitt@gibsondunn.com
STUART M. ROSENBERG (SBN 239926)
SRosenberg@gibsondunn.com
310 University Avenue
Palo Alto, CA 94301
Telephone:    650.849.5300
Facsimile:    650.849.5333

BRIAN A. ROSENTHAL (*pro hac vice*)
BRosenthal@gibsondunn.com
KATHERINE Q. DOMINGUEZ (*pro hac vice*)
KDominguez@gibsondunn.com
ALLEN KATHIR (*pro hac vice*)
AKathir@gibsondunn.com
ALLYSON PARKS (*pro hac vice*)
AParks@gibsondunn.com
200 Park Avenue
New York, NY 10166
Telephone:    212.351.4000
Facsimile:    212.351.4035

GIBSON, DUNN & CRUTCHER LLP
JAYSEN S. CHUNG (SBN 280708)
JSChung@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone:    415.393.8200
Facsimile:    415.393.8306

NATHANIEL R. SCHARN (SBN 305836)
NScharn@gibsondunn.com
3161 Michelson Drive, Suite 1200
Irvine, CA 92612
Telephone:    949.451.3800
Facsimile:    949.451.4220

HANNAH L. BEDARD (*pro hac vice*)
HBedard@gibsondunn.com
WENDY W. CAI (*pro hac vice*)
WCai@gibsondunn.com
1700 M STREET, NW
Washington, DC 20036
Telephone:    202.955.8500
Facsimile:    202.467.0539

*Attorneys for Defendant Samsara Inc.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MOTIVE TECHNOLOGIES, INC.,<br><br>   *Plaintiff and Counterclaim Defendant*,<br><br>  v.<br><br>SAMSARA INC.,<br><br>   *Defendant and Counterclaim Plaintiff*. | CASE NO. 3:24-CV-00902-JD<br><br>**DEFENDANT AND COUNTERCLAIM PLAINTIFF SAMSARA INC.'S TECHNOLOGY SYNOPSIS** |

**TABLE OF CONTENTS**

I.    **The '580 and '276 Patents** ................................................................................................. **1**
       A.    Historical Background ............................................................................................... 1
       B.    Camera Calibration and Parameters.......................................................................... 2
II.   **The '041 and '706 Patents** ................................................................................................. **5**
       A.    Wireless Sensor Networks ........................................................................................ 6
       B.    Intermittent Connectivity and Data Reconciliation ................................................. 7
       C.    Certificates and Device Authentication .................................................................... 8
III.  **The '685 Patent** .................................................................................................................. **9**
       A.    Vehicle Starting Systems .......................................................................................... 9
       B.    Remote Vehicle Immobilization ............................................................................... 9

**TABLE OF ABBREVIATIONS**

| Abbreviation | Meaning |
|---|---|
| '041 Patent | U.S. Patent No. 12,069,041 |
| '706 Patent | U.S. Patent No. 10,033,706 |
| '685 Patent | U.S. Patent No. 11,975,685 |
| '276 Patent | U.S. Patent No. 12,136,276 |
| '580 Patent | U.S. Patent No. 11,875,580 |
| Motive | Plaintiff and Counterclaim Defendant Motive Technologies, Inc. |
| Samsara | Defendant and Counterclaim Plaintiff Samsara Inc. |

Pursuant to Paragraph 8 of the Standing Order for Claim Construction in Patent Cases before Judge James Donato, Defendant and Counterclaim Plaintiff Samsara submits this written technology synopsis describing the technology relevant to the patents-in-suit.

## I.    THE '580 AND '276 PATENTS

Motive asserts the '580 and '276 Patents.[1]  The '276 Patent is a continuation of the '580 Patent. As background for the tutorial, this synopsis covers: (A) background on computer vision; and (B) camera calibration and parameters.

### A.  Historical Background

Computer vision is a field focused on enabling computers to interpret and extract information from visual data, such as images and video.  The field emerged in the 1970s, when computers became powerful enough for researchers to explore computational methods for analyzing visual information.  Today, computer vision underlies technologies ranging from vehicles to medical imaging to facial recognition.

Within the vehicle space, researchers began exploring vision-based systems in the 1980s, and by the mid-2000s, single-camera systems for driver assistance—such as lane departure warnings and forward collision detection—began appearing in commercial vehicles.  During this period, researchers increasingly incorporated different models—including neural networks as well as other statistical and rule-based approaches—into these systems.  By the 2010s, advances in deep learning significantly improved performance, enabling more robust object detection, driver monitoring, and real-time decision-making in driver assistance systems.  By the end of that decade, researchers had applied a variety of techniques developed in the broader machine learning field to road safety tasks, including convolutional neural networks, recurrent neural networks, and deep reinforcement learning.

One particular challenge in computer vision is understanding depth and scale—figuring out how far away objects are and how large they are—based on flat, two-dimensional images.  When a camera captures a photograph, it projects a three-dimensional scene onto a two-dimensional plane (i.e., the imaging sensor such as a charge-coupled device), and in doing so, information about depth and scale is lost.  Consider a view of a room from a fixed point of observation, as shown in the image below.

---

[1] Motive has also asserted U.S. Patent No. 12,062,243.  The parties have not proposed any terms from that patent for construction, and therefore, Samsara has not included it in this tutorial.



In the real world, depth and distance are directly perceived from this viewpoint. However, in the resulting 2D image, the scene is flattened into a projection, and much of the depth information is lost. From the image alone, it becomes difficult to determine the true distances, sizes, or spatial relationships of objects, since different 3D configurations can produce the same 2D projection. For instance, a small car close to the camera and a large truck far away might appear the same size in a photograph and the image alone cannot reveal which interpretation is correct.

With proper calibration and known reference points such as the standard height of a doorframe, a system can deduce the person's distance and actual height. Despite such techniques, this type of depth ambiguity has historically been more difficult for single-camera systems to resolve. Unlike human eyes, which use the slight difference (parallax) between two viewpoints to perceive depth, a single camera captures only one perspective, offering no easy way to triangulate (that is, calculate distances by comparing multiple perspectives) how far away objects are.

To recover depth and scale from a flat image, computer vision systems rely on additional cues, such as prior knowledge about the size or shape of objects in a scene, observations from multiple angles, or reasonable assumptions about the environment. For example, if a system knows that standard stop signs are 30 inches wide in the United States, it can use how large a stop sign appears in an image to estimate how far away it is, where a smaller appearance means a greater distance. One way for a camera to understand an image is through camera calibration.

### B. Camera Calibration and Parameters

Before a computer vision system can interpret information from a single camera source, it must first understand how that camera captures images. This understanding requires establishing certain

characteristics of the camera's positioning relative to the environment within which it is deployed. As an elementary example, consider the forward looking and rear facing cameras performing pedestrian detection in most modern vehicles. The "labeling" of each camera source must be assigned such that the detection system knows to use the forward-facing camera when in a forward gear and the rear facing camera when in reverse. In addition, each camera may be positioned differently such that the rear-facing camera is attached to the trunk whereas the forward-facing camera is attached at a different height from the road surface. Each camera may also have different lenses allowing for different width of field to be analyzed. Such properties of each camera are known as camera parameters and the setting or initialization of such parameters for the specific application is called camera calibration.

There are two general approaches to camera calibration: controlled calibration and dynamic calibration.

Controlled calibration involves taking images of a known pattern, commonly a checkerboard. Checkerboards are useful because they have a regular, predictable pattern with easily detectable corners, and because the spacing between squares is precisely known in advance. The system adjusts the camera parameters until the observed image matches the expected appearance of the pattern. This approach, however, requires access to a known pattern and is not suitable when the camera must be recalibrated dynamically during operation.

Dynamic calibration relies on features naturally present in the environment and appearing in an image as a substitute for a pre-defined calibration pattern. From these features, a camera then computes camera parameters. In urban environments, for example, systems can use the regular structure of buildings—such as parallel edges and right angles—to estimate camera parameters. Similarly, automobile systems can use lane lines, which are usually parallel and equally spaced, as a basis for calibration. Systems can also use the vanishing point—the spot in an image where parallel lines, like railroad tracks, appear to converge in the distance—to calculate camera parameters. Additionally, systems may rely on the horizon line, which represents where very distant points on the ground appear in an image, to determine how the camera is angled relative to the ground.

Regardless of which environmental features are used, the first step in dynamic calibration is to accurately identify the image features, such as road lines, used for calibration. This step is critically

important, as even slight inaccuracies in feature identification can lead to errors in the estimated camera parameters and, consequently, in the overall system output.  This step, however, creates a circular challenge—something of a chicken-and-egg problem: determining accurate camera parameters requires first identifying environmental features, but accurately identifying those features depends on already having proper calibration.  For example, if the system initially mistakes a curved road marking for a straight one, its calibration will be off, which will then cause further misidentification of road features.  There are multiple ways to address this problem, including starting with an initial approximation of the camera parameters and progressively improving both the feature identification and calibration over time.  Additionally, systems can use human in the loop systems, which rely on human reviewers to manually review and adjust or confirm the initial identification of the environmental features used for calibration.  Once features are accurately identified, the system can then compute the camera parameters.

There are many examples of camera parameters.  Some parameters reflect the camera's position and orientation—such as its height above the ground, its angle of tilt up or down (pitch), and its rotation left or right (yaw).  These are significant because the same real-world scene may appear very different when photographed from the left versus the right, when the camera is tilted up versus down, or when the camera is mounted at a higher or lower point.  In vehicle applications, these orientation parameters can be expressed in terms of the camera's relationship to the road surface.  The road plane (or ground plane) normal vectors are a three-dimensional representation of the pitch and roll angles of the camera relative to the road.  To understand this, imagine an arrow pointing perpendicular to the pavement—on flat ground, this arrow points toward the sky; on a hill, it tilts.  The road plane normal encodes the camera's pitch and roll angles relative to the road in terms of this arrow.  While representing the pitch and roll angles in this way can be less intuitive for human interpretation, the road plane normal vector is often preferred in computation.

Other parameters relate to the camera's optics.  The focal length, a property of the camera's lens, determines how zoomed-in the image appears—a longer focal length makes distant objects appear closer.  The lens also introduces distortion, often causing straight lines near the edges of an image to appear slightly curved.

These parameters are the key to interpreting an image.  Critically, if these parameters change, the captured image will be different, even if the scene is the same.  Consider a dashboard-mounted camera in a vehicle.  If the camera is bumped and tilts slightly downward, the horizon line will shift higher in the image, and objects on the road will appear at different positions than before—even though in the real world, the horizon line, objects, and the road themselves have not moved.  Similarly, if the focal length changes, a stop sign fifty feet away might now appear closer or farther than it actually is. The physical world remains unchanged, but the camera's representation of it has shifted.

Conversely (and importantly), a camera's parameters do not change based on what the camera is viewing or how the vision system interprets the images from the camera after the calibration step(s).  A dashboard camera has the same focal length and mounting angle whether it's pointed at a busy intersection or an empty road.  These parameters are properties of the camera and its physical configuration itself, not characteristics of any particular scene—which is why, once calibration is complete, the system can use those parameters to accurately understand any scene the camera captures.  Thus, the computer vision system generally must first estimate these camera parameters to use a two-dimensional image to accurately predict information about the three-dimensional scene.

Not all single-camera systems require calibration to understand an image.  Some approaches instead use artificial intelligence to detect and classify objects directly, then estimate distance based on the known typical dimensions of recognized objects.  For example, such systems can determine how far away a vehicle is based on its apparent size relative to standard vehicle dimensions.

For single-camera systems that do rely on calibration, however, camera parameters are important to inferring three-dimensional structure.  Thus, accurate camera calibration is important for reliable depth and distance estimation in single-camera systems, particularly in vehicle applications where misjudging the position of obstacles can have serious consequences.

## II.    THE '041 AND '706 PATENTS

Two of Samsara's three asserted patents are the '041 and '706 Patents.  The '706 Patent is related to the '041 Patent and both share much of the same specification.  As background for the tutorial, this synopsis covers: (A) wireless sensor networks, including the devices that make up these networks and how they communicate; (B) the challenge of intermittent connectivity and the role of sequence numbers

and time stamps in reconciling duplicate data; and (C) the use of certificates to authenticate device connections.

### A.    Wireless Sensor Networks

A wireless sensor network is a system of devices that monitor physical or environmental conditions—such as temperature, humidity, pressure, or movement—and communicate the resulting data through the network to a central location where it can be viewed by a user.  These networks have applications across many industries, including monitoring the temperature of refrigerated goods during transport, tracking the location of fleets of vehicles, and recording environmental conditions in warehouses or buildings.

A typical sensor network involves three types of devices.  First, a wireless sensing device (sometimes called an environmental monitor or sensor) detects physical events or information and records sensor measurements.  For example, a temperature sensor placed inside a refrigerated truck might record the temperature periodically (e.g., once per minute) and store those measurements in its onboard memory.  Second, a gateway device serves as an intermediary, collecting data from one or more wireless sensing devices and relaying that data onward.  The wireless sensing device and the gateway device typically communicate over a short-range wireless protocol, such as Bluetooth Low Energy ("Bluetooth LE").  Both the wireless sensing device and the gateway device may be located in the same vehicle—for instance, a temperature sensor and a gateway mounted inside a delivery truck.  Third, a management server can receive data from gateway devices, store it, organize it, and present it to users through a display interface.  The gateway device typically communicates with the management server over a longer-range connection, such as a cellular or Wi-Fi network.

In operation, the wireless sensing device records sensor measurements over time and may transmit those measurements to the gateway device, in some implementations, over a secure communication channel.  The gateway device may then transmit the data onward to the management server, which stores the data and provides it for display to a user.  When the gateway device successfully receives data from the wireless sensing device, it may send an acknowledgment message back to the wireless sensing device, instructing it to delete the transmitted measurements from its onboard storage to free up space for new recordings.

In a vehicle fleet context, a management server may manage multiple sensor networks across many vehicles and organizations, tracking which gateway devices and wireless sensing devices belong to which organization.

### B.    Intermittent Connectivity and Data Reconciliation

A challenge in wireless sensor networks is intermittent connectivity.  The communication channels between devices may be disrupted for a variety of reasons.  The connection between a gateway device and the management server may be lost because the gateway is located on a moving vehicle that passes through an area without cellular or Wi-Fi coverage.  The connection between a wireless sensing device and a gateway device may be lost due to a failure of a communication interface at one of the devices, because of a failure of the gateway device itself, because the gateway device is turned off (e.g., if the gateway is only on while the engine is running), or because the wireless sensing device has moved out of range of one gateway—for example, when a sensor is attached to a package that is transferred between delivery trucks.

When connectivity is interrupted and later restored, a device may retransmit data that was previously sent, because the device may not know whether the earlier transmission was successfully received.  This can result in the management server receiving duplicate data.  For example, a wireless sensing device might transmit temperature readings to a gateway, lose its connection before receiving an acknowledgment, and then retransmit the same readings—along with any new readings—once another connection is established, whether with the same gateway or a different one.  Also, due to real world conditions that may affect data transmission, data may be received by a gateway or a management server in a different order than it was transmitted.

To address these challenges, sensor data may be transmitted with additional information that enables the management server to identify and remove duplicates.  Two examples of such additional information are sequence numbers and time stamps.  By comparing sequence numbers and time stamps from different transmissions, the other devices in the system, such as a gateway or a management server, can reconcile the data.  This allows the system to identify overlapping measurements, remove duplicates, identify the order that data should be presented or displayed, and produce an accurate, uninterrupted representation of the sensor measurements over time for display to the user.

For example, a temperature sensor may record environmental information (such as the temperature of a refrigerated truck trailer) at 10:15, 10:16, 10:17, and 10:18 a.m. The sensor transmits all four readings to a gateway device, but the connection is interrupted before the sensor receives confirmation that the gateway received the data. The sensor does not delete the data because it has not been told the data was received. When the sensor later reconnects—either to the same gateway or to a different one—it retransmits all four readings along with any new readings taken during the interruption. The management server now has two copies of the 10:15 through 10:18 a.m. readings. Using the sequence numbers and time stamps, the management server can identify and remove the duplicates and arrange the data in the order it should be displayed, preserving a single, accurate record of the temperature over time.

### C.    Certificates and Device Authentication

In a sensor network with multiple gateway devices and multiple wireless sensing devices—such as a fleet of vehicles, each with its own gateway and sensors—it is important to ensure that a given gateway communicates with the correct wireless sensing devices. For example, sensor networks for two different organizations may rely on the same management server, operated by a third party service provider. Truck A may belong to Organization A, and Truck B may belong to Organization B. To keep Organization A's data secure, the gateway in Truck A should communicate with the sensors assigned to Truck A, not with sensors assigned to Truck B.

In another scenario, Organization A may have two trucks, Truck A-1 and Truck A-2. Organization A may want the sensors of Truck A-1 and A-2 to communicate with the gateway in either truck if they are in range. For example, Truck A-1's engine may be off, and the vehicle's gateway may be configured to turn off when the engine is off. Meanwhile, Truck A-1's sensors continue to record environmental data, even though Truck A-1's gateway is powered off. If truck A-2 comes within range, the sensors of Truck A-1 may then use the gateway of Truck A-2—all part of the same organization—to offload their measurements and relay data to the management server.

A certificate is one mechanism for confirming that a wireless sensing device or set of wireless sensing devices are authorized to connect with a particular gateway device. When a wireless sensing device becomes associated with a gateway—for example, when a fleet operator assigns a particular sensor to a particular vehicle—the management server may generate a certificate reflecting that association. The

certificate may then be transmitted to the gateway device. When the wireless sensing device later attempts to connect to the gateway, the gateway can use the certificate to confirm that the wireless sensing device is authorized to connect and to transmit its sensor data. In the examples above, the certificate may reflect that the sensors in Truck A, A-1, and A-2 are associated with Organization A, and may therefore communicate with the gateways located in Truck A, A-1, and A-2.

## III.    THE '685 PATENT

Samsara also asserts the '685 Patent. The technology relevant to the '685 Patent concerns a vehicle's ignition system and a device or system that can remotely control whether the starter motor receives power. As background for the tutorial, this synopsis covers: (A) vehicle starting systems and (B) remote vehicle immobilization.

### A.    Vehicle Starting Systems

In a conventional vehicle with an internal combustion engine, starting the engine requires electrical power from the vehicle's battery to reach the starter motor. When a driver turns a key or presses the engine start button, the starting system allows electrical power to reach the starter motor. Wiring between the battery and the starter motor allows current to flow between the battery and the starter motor.

### B.    Remote Vehicle Immobilization

Fleet operators and vehicle owners sometimes need the ability to prevent a vehicle from being started—for example, to restrict use by unauthorized drivers, to prevent operation under unsafe conditions, or for theft prevention. However, controlling vehicle use can be difficult once the vehicle has left the operator's physical control.

A remote vehicle immobilizer addresses this challenge by placing a switch in the path between the battery and the starter motor. When the switch is closed, such that the path between the battery and the starter motor is not interrupted by the switch, current can reach the starter motor, and the vehicle can start normally. When the switch is open, such that the path between the starter motor and the battery is interrupted, current cannot reach the starter motor, and the vehicle cannot be started.

In a vehicle fleet context, a remote command may be sent from a remote system—such as by a user interfacing with a cloud network or application on a computer or mobile device—and relayed through a gateway device installed in the vehicle or relayed directly to the immobilizer. The gateway device or

immobilizer can communicate wirelessly over a cellular or Wi-Fi connection with remote systems to receive these remote commands.

DATED: April 2, 2026

Respectfully submitted,

*/s/ Josh A. Krevitt*

Josh A. Krevitt (SBN 208552)
Brian A. Rosenthal (*Pro Hac Vice*)
Katherine Q. Dominguez (*Pro Hac Vice*)
Allen Kathir (*Pro Hac Vice*)
Allyson Parks (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
JKrevitt@gibsondunn.com
BRosenthal@gibsondunn.com
KDominguez@gibsondunn.com
AKathir@gibsondunn.com
AParks@gibsondunn.com

Jaysen S. Chung (SBN 280708)
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200
Facsimile: 415.393.8306
JSChung@gibsondunn.com

Stuart M. Rosenberg (SBN 239926)
GIBSON, DUNN & CRUTCHER LLP
310 University Avenue
Palo Alto, CA 94301
Telephone: 650.849.5300
Facsimile: 650.849.5333
SRosenberg@gibsondunn.com

Nathaniel R. Scharn (SBN 305836)
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive, Suite 1200
Irvine, CA 92612-4412
Telephone: 949.451.3800
Facsimile: 949.451.4220
NScharn@gibsondunn.com

Hannah L. Bedard (*Pro Hac Vice*)
Wendy Cai (*Pro Hac Vice*)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036-4504
Telephone: 202.955.8500
Facsimile: 202.467.0539
HBedard@gibsondunn.com
WCai@gibsondunn.com

*Attorneys for Defendant and Counterclaim Plaintiff Samsara Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that counsel of record who are deemed to have consented to electronic service are being served on April 2, 2026, with a copy of this document via electronic mail.

/s/ Josh A. Krevitt
Josh A. Krevitt